Richard H. Lee, Plaintiff-Appellant, v. Police Board of
The City of Chicago, Defendant-Appellee.

Gen. No. 50,755.

First District, Second Division.

June 21, 1966.

Daniel A. Gallagher, of Chicago, for appellant.

Raymond F. Simon, Corporation Counsel, of Chicago (Sydney R. Drebin, Assistant Corporation Counsel, and Harry H. Pollack, Special Assistant Corporation Counsel, of counsel), for appellee.

MR. JUSTICE LYONS delivered the opinion of the court.

This is an appeal from an order entered in favor of defendant, affirming the decision of the Police Board of Chicago, discharging plaintiff from his position as a patrolman in the Chicago Police Department.

According to one James G. Righeimer, on July 21, 1962, about 11:50 p. m., he was parked in an automobile, with a woman, on Simonds Drive north of Lawrence Avenue, on Chicago's lakefront. Simonds runs north and south and Lawrence runs east and west. A Chicago policeman came to Righeimer's automobile and requested him to get out. Righeimer and the policeman left the automobile and went behind some shrubbery. The policeman

asked Righeimer for money and Righeimer gave him $10. On the following Monday or Tuesday, Righeimer told Len O'Connor, a television commentator of N. B. C., about his experience and thereafter wrote O'Connor a letter about it. O'Connor gave said letter to the Police Deparment and said department's Internal Investigations Division, hereinafter referred to as I. I. D., started a surveillance of policemen in the area in question.

At the trial Sergeant Joseph Nemec testified that he was the supervising sergeant assigned to the special investigation unit of I. I. D.; that on July 27, 1962, he was assigned to investigate Righeimer's letter; that Righeimer came to Nemec's office where he gave an oral and written statement; that Righeimer could not identify plaintiff from photographs shown him; that between July 27 and August 11, 1962, Nemec and policeman August Annerino kept under surveillance the parking area on Simonds, between Lawrence and Foster (Lawrence being 4800 North and Foster 5200 North); that on August 1st, at night, he and Annerino saw plaintiff alone in police patrol car 5494, driving on the pedestrian path and bridle path, east and adjacent to Simonds; that said patrol car had no lights; that plaintiff parked wherever there was dense growth between Simonds and whatever path said patrol car was on; that said patrol car was parked with the motor running; and that plaintiff would leave the patrol car and look into the side and rear windows of automobiles parked in the area.

Nemec also testified that on August 8th, at night, he and Annerino again saw plaintiff with patrol car 5494; that plaintiff spoke to a man in a parked automobile; that the man left the automobile and went into the bushes with plaintiff; that the man then reentered his automobile and drove away; that thereafter Nemec learned the man was a Mr. Dahlgren; and that at the time plaintiff was with Dahlgren, the motor of plaintiff's patrol car was running, one side door thereof was open and plain-

tiff was about 100 feet from it with no one in the vehicle.

Nemec further testified that on August 9th he and Annerino again observed plaintiff use the same method; that on the night of August 11th, he and Annerino saw plaintiff in said area at three different times; that they stayed in their automobile; that they saw a policeman come out of the bushes near their automobile; that he walked along Simonds between the bushes and the curb, to an automobile occupied by Modesto Sosa and a woman; that Nemec and Annerino left their automobile and wrote down Sosa's license number; that they then went to Sosa's automobile to observe the activities of Sosa and said policeman; that Nemec told Annerino to inspect the area west of Simonds and north of Sosa's automobile and Nemec inspected the area south thereof, for the purpose of identifying said policeman; that Nemec did not find said policeman; that Nemec then went to Sosa's automobile and identified himself as a policeman and asked Sosa about his conversation with said policeman; that Nemec then returned to his automobile, and as he was about to enter it, saw a policeman come out of the shrubbery directly in front of his automobile; that a police patrol car was then coming south on Simonds; that said policeman looked in the direction of said patrol car, which had on its blue dome light and a white spotlight; that said policeman removed his cap and Nemec saw that it was plaintiff; that plaintiff then entered a 1959 light blue Ford station wagon; that Nemec then entered his automobile and was soon joined by Annerino; that they waited until the patrol car approached them and signaled them to leave the area, along with other automobiles parked there; that as Nemec's automobile backed into Simonds, he took down the license number of plaintiff's station wagon which was still parked there with plaintiff in it; that Nemec and Annerino then followed the patrol car going on Simonds; that plaintiff then drove

137

past Nemec and stopped to the left and adjacent to the patrol car, being driven by policeman Ronald Hardt; that after a while, plaintiff left and Hardt continued his patrolling; that he and Annerino then went to Sosa's automobile and asked him to follow them; that after they left the park, Nemec entered Sosa's automobile, again identified himself and questioned him about his business with the policeman; that Sosa told him what happened; and that Sosa then went with Nemec and Annerino to the I. I. D. headquarters in Washington Park where Sosa retold his story and that Sosa was shown some photographs of policemen and picked out a photograph as being that of the one he gave the $10.

Nemec also testified that he conducted a police showup on August 14th; that Righeimer identified plaintiff as the policeman to whom he had given $10; that at said showup, plaintiff was present with five other policemen; that prior to said showup, plaintiff exchanged his policeman's cap and shirt with another policeman so that identification could not be made by the number on the cap or star; and that at said showup, the participating policemen were instructed to give fictitious answers and wrong names to questions put to them.

Nemec further testified that he had been a policeman for 15 years; that he had investigated many cases and conducted many surveillances; that when he started a surveillance of policemen in the area in question, it was not for the purpose of watching any particular policeman, but to watch all policemen in the area; that he put plaintiff's photograph among the ones he showed to Sosa because plaintiff's behavior with Sosa was the same behavior plaintiff previously used with Dahlgren and Righeimer; that policemen, other than plaintiff, while patrolling the area in question in a patrol car, did not leave their patrol car as plaintiff did; and that from July 27th to August 11th, the period he and Annerino had the area in question under surveillance, they

observed the activities of all the policemen there but only the activities of the policeman in patrol car 5494, plaintiff's patrol car, were peculiar.

Patrolman August J. Annerino testified that his testimony would corroborate Nemec's testimony and, additionally, that before he entered the automobile where Nemec was sitting on the night of August 11th–12th, he was sitting on a bench; that plaintiff walked past him; and that it was about 5 minutes before midnight on August 11th, that he and Nemec saw the man in the uniform of a Chicago policeman talking to Sosa.

Modesto Sosa testified that on August 11–12, 1962, around midnight, on Simonds near Lawrence, he was parked in an automobile with Olga Casillas; that he saw a policeman come out of the bushes; that plaintiff came to Sosa's automobile and motioned for Sosa to get out of his automobile; that Sosa did so and he and plaintiff walked away from the automobile; that plaintiff told him that if he gave plaintiff $10, plaintiff would not take him in; that he gave plaintiff $10; that Sosa then returned to his automobile and after 5 minutes, a man in civilian clothing appeared and identified himself as a policeman; that said man told him to wait in his automobile until he returned; that said man was Sergeant Nemec; that when Nemec returned, Nemec told him to follow him, which Sosa did; that Nemec wanted a statement but he told Nemec he was willing to forget the $10; that Nemec took him to the I. I. D. headquarters where he gave a statement; that he was shown some photographs and picked out one which was a photograph of plaintiff; that the next day he appeared at a showup of about 12 to 14 policemen where he identified plaintiff; that when he was first asked by Nemec to sign a criminal complaint against plaintiff he refused because he did not want to go to court; that at the time he first saw plaintiff, there were lights in said area; that at said time he observed plaintiff's face; that after he

139

gave plaintiff $10, he walked back about 50 feet to his automobile; and that he was sure of his identification of plaintiff's photograph.

Olga Casillas testified that at the time in question she was with Sosa; that she saw a policeman come to Sosa's automobile; that she could not identify him; that she did not hear any of the conversation between Sosa and said policeman; that about 4 minutes after Sosa came back to his automobile after talking to said policeman, Nemec appeared and talked to Sosa.

Patrolman Ronald Hardt testified that on August 11, 1962, he relieved plaintiff; that Hardt's tour of duty was from 11:30 p. m. on said date to 7:30 a. m. on August 12th; that he used the same patrol car that plaintiff used; that during said tour of duty, around midnight, he was in the parking area on Simonds near Lawrence and saw plaintiff there in his police uniform; that plaintiff wanted a seat cushion and newspaper from the patrol car but took only the newspaper and left the cushion for Hardt's use; that said parking area was a part of Hardt's beat; that he had orders to clear said area at midnight; and that he saw Nemec and Annerino there at said time but did not find out until later that they were policemen.

Plaintiff testified that he lived at 4725 N. Whipple, Chicago; that he became a Chicago policeman on July 1, 1957; that in 1958, he was accused by a motorist of soliciting a dollar; that he was suspended but acquitted of said charge; that during July 1962, he was assigned to patrol car 5494 out of Summerdale Station; that on July 21, 1962, he did not have a conversation with or solicit money from Righeimer, but he was not sure whether he had worked on said date; that he did not solicit or get money from Sosa; that on August 11, 1962, he started his tour of duty at 3:30 p. m. in patrol car 5494; that his beat was from Lawrence to Ardmore

140

and from Broadway to the beach on Lake Michigan; that he finished his tour of duty at 11:35 p. m. the same day and turned his patrol car over to Hardt on Foster and Winchester across the street from the Summerdale Station; that after he left Hardt, he went into the station to leave his gas sheet and books; that from the station he went to Winchester near Farragut, took his station wagon and went home, which was about a mile southwest from the station; that he did not know what time he got home, but as soon as he walked into his front door, he remembered that he had left his seat cushion and newspaper in the patrol car, so he immediately got back into his station wagon and went back to the station; that when he got to the station, he saw that patrol car 5494 was not there so he proceeded down Foster towards the lakefront; that when he got to Simonds it was one minute to midnight; that he drove to the Simonds' parking area looking for patrol car 5494 and not finding it he continued south on Simonds to Lawrence, made a U-turn and went back to the parking area and parked facing west on Simonds between Lawrence and Foster; that he remained in his station wagon for a couple of minutes; then got out and looked toward the rear of his station wagon to see if the patrol car was coming; that he then walked to the front of his station wagon, got up on the curb and looked over the bushes to see if the patrol car was coming; that he then got back into his station wagon; that at said time he did not see any policemen; that he then saw a blue mars light to the north so he got out of his station wagon to see if it was patrol car 5494, which it was; that he got back into his station wagon, backed out and got abreast and to the left of the patrol car and spoke to Hardt through the open windows of both vehicles; that at this time he was south of the midway point between Foster and Lawrence; that he asked Hardt if he wanted

141

to use the cushion and when Hardt said he did, plaintiff drove on about 100 feet, parked and ran back to the patrol car to ask for his paper, which he got; that plaintiff then returned to his station wagon and drove towards Lawrence; that he then drove to Montrose Beach to see how the fishermen were doing and after talking to one of the fishermen, plaintiff drove back to Simonds toward Lawrence, then to Lawrence and home; that the next day, August 12th, he reported for duty at 3:30 p. m. to his station, when he and other policemen, then present, were told to stand at attention for observation; that he did not remember seeing Sosa there but he did see Nemec; that thereafter he went out to get his patrol car and was told by Lieutenant James Sheridan that he was identified in the lineup and asked to return to the station; and that from the station he went to I. I. D. headquarters in Washington Park where he gave a statement; and that on August 14, 1962, he participated in a showup at Traffic Court, 321 N. LaSalle Street.

On September 7, 1962, the Superintendent of Police filed charges against plaintiff with the Police Board. Plaintiff was charged with violation of sections 5, 8, 12, 13 and 24 of Rule 374 of the Rules and Regulations of the Chicago Police Department, being: (5) conduct unbecoming a police officer; (8) violation of law; (12) incapacity or inefficiency in the service; (13) disobedience of orders; and (14) making a false official report on July 21, August 1, 8, 9, 11 and 12, 1962. Plaintiff was also charged with soliciting and accepting $10 from James Righeimer on July 21, 1962, in return for not arresting said Righeimer; with soliciting and accepting $10 from Modesto Sosa on August 12, 1962, in return for not arresting said Sosa; with violating sections 16–10 (Extortion), 33–1–a (Bribery) ; and 33–3–B (Official Misconduct) of chapter 38 of the Ill Rev Stats of 1961. Plaintiff was further charged with violation of Rule 134

of the Rules and Regulations of the Chicago Police Department on August 1, 8, 9 and 11, 1962. Said rule provides for safeguarding of police vehicles by police personnel. It states: "When a radio equipped vehicle is standing idle but is in service and available for calls, at least one member of the crew shall always remain with the vehicle to receive any alarm that may be broadcast, unless urgent police business necessitates its abandonment. On one man vehicles the operator will take the vehicle off the air and lock same whenever it is necessary to leave it in order to handle police business. On his return to the vehicle he will contact the squad operator and have the vehicle put in service." Finally plaintiff was charged with violating Rule 142 of the Rules and Regulations of the Chicago Police Department. It states: "When a police vehicle is stopped for the purpose of police business or the officer or officers have alighted to correct a motorist for a violation, the dome light of such vehicle shall remain in operation until the officer or officers have completed their duties. . . ."

A hearing was had on the foregoing charges before the Police Board on March 22, 1963, and on May 10, 1963, the Police Board rendered its Finding and Decision in which plaintiff was found guilty of violating section 5 of Rule 374, conduct unbecoming a police officer, in that on July 21, 1962, and August 12, 1962, he solicited and received $10 from James Righeimer and Modesto Sosa, respectively, in return for which plaintiff agreed not to arrest them and plaintiff was ordered discharged from the Police Department.

On June 10, 1963, plaintiff filed his complaint for administrative review of the Finding and Decision and on April 28, 1965, the trial court affirmed the Finding and Decision. This is an appeal from that order.

Plaintiff's theory of the case is (1) that the lower court erred in not sending the case back to the Police Board for a new trial due to Police Board errors in

(a) not compelling the witness, Righeimer, to disclose the identity of his female companion and in (b) failing to strike Righeimer's entire testimony upon his failure to testify as to the identity of his female companion and (2) that the lower court, sitting in administrative review of the Chicago Police Board, erroneously considered itself powerless to evaluate the evidence before the Police Board upon the record as a whole.

██ In support of his first contention, plaintiff relies on DuBois v. Gibbons, 2 Ill2d 392, 118 NE2d 392 (1954). That case dealt with the power of a court to compel a witness to testify to the name of an occurrence witness. We agree with plaintiff there is no substantial difference between the refusal of a witness to be cross-examined and the failure of a court to compel a witness to state the name of his companion. We further agree that if in fact the testimony was not privileged, the lower court should have allowed the witness to testify to the name of his companion. Even though error was committed by the trial court, however, we do not feel that it was prejudicial to plaintiff. If Righeimer's female companion was subpoenaed by plaintiff and compelled to testify, she would only have revealed that the officer, who accepted the bribe, was not plaintiff. We feel there was sufficient identification within the record, taken as a whole, to substantiate the identification of plaintiff as the officer who had taken the bribe. Both Righeimer and Sosa testified that plaintiff was the party that accepted money from them. The fact that Sosa's female companion did not identify plaintiff can be explained by the fact that she was inside the car and did not take part in the bribery transaction.

██ Plaintiff's contention that the entire testimony of a witness should be stricken, where the witness refuses to submit to cross-examination, is indeed valid. Wigmore on Evidence, 3rd ed, 2d Sec 1391. As we have described above, however, the effect of the witness' re-

fusal to give, and the court's failure to compel said witness to give, the name of said witness' female companion, had no prejudicial effect on plaintiff.

Finally, we must consider plaintiff's contention that the lower court erred in considering itself powerless to evaluate the evidence before the Police Board upon the record as a whole. The court below stated: "In my opinion, on this case, the decision was rather a weak case against Lee, and I would have rendered a decision in Lee's favor as was done in the Criminal Court, under the indictment." The trial court also stated ". . . there was highly serious doubt as to the testimony of the Mexican, when he said he took $10.00 from him."

█ █ It is true as defendant points out that on administrative review, the court does not weigh the evidence and its function is limited to ascertaining if the finding and decision of the administrative agency is supported by substantial evidence taken from the record as a whole. Thus, if there is competent evidence to support the findings, the decision will be affirmed. Monroe v. Civil Service Commission of Waukegan, 55 Ill App2d 354, 360, 204 NE2d 486 (1965).

At the outset, we do not feel that the remarks made by the trial judge can be construed to mean that the trial court felt itself powerless to evaluate the evidence before the Police Board upon the whole record. The fact that the trial court stated that it would have rendered a decision in Lee's favor, as was done in the Criminal Court under the indictment, does not manifest any such construction, in that the decision in the Criminal Court required a higher degree of proof (beyond a reasonable doubt) against plaintiff than in the instant case. Furthermore, the trial court's statement that there was serious doubt as to the testimony of the Mexican, could only manifest a feeling on the part of the trial court that it was powerless to act if in fact the testimony of Righeimer was disregarded. As stated above, Righei-

mer's testimony was properly admitted and considered by the lower court.

▮▮ Plaintiff questions whether there was enough evidence from the Sosa incident, standing by itself, to justify the Police Board decision. Again we feel there was sufficient evidence and that the decision of the lower court was proper. Thus, any remarks made by the trial court, stating an incorrect proposition of law, are not grounds for reversal, if in fact the right result was reached.

For the above reasons, the judgment of the lower court is affirmed.

Judgment affirmed.

BRYANT, P. J. and BURKE, J., concur.