(No. 99941.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. A PARCEL OF PROPERTY COMMONLY KNOWN AS 1945 NORTH 31ST STREET, DECATUR, MACON COUNTY, ILLINOIS (Moises Luna *et al.*, Appellants).

*Opinion filed December 15, 2005.*

484

Moore, Susler, McNutt & Wrigley, L.L.C., of Decatur (William A. McNutt, Robert I. Wrigley and Nicholas C. Phipps, of counsel), for appellants.

Lisa Madigan, Attorney General, of Springfield (Gary Feinerman, Solicitor General, and Linda D. Woloshin and Katherine D. Saunders, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Pursuant to the Drug Asset Forfeiture Procedure Act (Forfeiture Act) (725 ILCS 150/1 *et seq.* (West 2002)), the State initiated civil forfeiture proceedings in the circuit court of Macon County against several parcels of real estate. Claimants, Moises and Ramona De Luna, answered. At the close of a hearing, the circuit court entered an order of forfeiture. A divided appellate court affirmed the order of the circuit court. No. 4—03—0917 (unpublished order under Supreme Court Rule 23). We allowed claimants' petition for leave to appeal (177 Ill. 2d R. 315(a)), and now affirm the judgment of the appellate court.

## BACKGROUND

In January 2003, the State filed a complaint for forfeiture of a single family residence at 1945 North 31st

Street in Decatur, and two vacant and unimproved lots, known as lots 214 and 215 in Meadowlark Fourth Addition, Macon County. Claimants are the owners of record of the property. However, the State alleged that this real estate was actually owned by claimants' son, Miguel Luna, and was related to felony drug offenses that he committed. According to the complaint, Miguel provided $40,000 cash as a down payment on the property at 1945 North 31st Street and was the true owner of the premises. This property was placed in the name of claimants "in an attempt to hide the identity of the true owner in the event that Miguel Luna would be caught dealing drugs." Further, according to the complaint: "Nearly all of Miguel Luna's property [was] held in the name of [claimants] for the same reason." The State alleged, therefore, that the real estate was subject to forfeiture under the Cannabis Control Act (720 ILCS 550/12(a) (West 2002)) or the Illinois Controlled Substances Act (720 ILCS 570/505(a) (West 2002)).

Claimants filed a claim to the real estate, and each filed an answer responding to the State's allegations. Claimants each stated that the funds for their real estate came from a sale of property in Mexico and from loans from several individuals. Ramona additionally claimed that the 1945 North 31st Street residence was the homestead of her and Moises and that they held title as tenants by the entirety.

The circuit court held a hearing on the complaint for forfeiture. Both sides presented testimony, which the court heard for four days interspersed between March and June 2003. The court did not make any findings prior to hearing all of the evidence.

At the hearing, Decatur police Detective David Dailey testified that the Decatur police department began an investigation into the suspected drug dealing of a man subsequently identified as Miguel Luna. Dailey coordi-

nated the investigation and oversaw a surveillance team consisting of officers and detectives from the Decatur police department.

Detective Dailey's unit conducted surveillance on Miguel from March to November 2002. The surveillance team followed Miguel, observed his activities, checked the license plates of his vehicles, and established an observation post near his residence. Pursuant to this investigation, the team discovered that Miguel was using the name Jose T. Cervantes and living in a mobile home at 2299 North 37th Street in Decatur. A 1996 Nissan Altima was registered to a Jose T. Cervantes of that same address. During the investigation, the surveillance team also observed Miguel operate a 1995 Chevrolet Lumina, which was registered to a Jose T. Cervantes. The address listed in this registration was that of a mobile home next door to where Miguel resided. The surveillance team also observed Miguel operate a Chevrolet pickup truck registered to a Tina and Felipe Herrera. In late October or early November 2002, Miguel moved into the house in question in this case, at 1945 North 31st Street. The surveillance team did not learn of Miguel's true identity until he was arrested on November 20, 2002.

Claimant Moises was first observed by the surveillance team on November 19, 2002. On that day, at approximately 7 p.m., Moises arrived at the 1945 North 31st Street home, driving the Nissan Altima. He backed into the driveway, where the Chevrolet Lumina was already parked, such that the trunks of the Altima and the Lumina were back-to-back. Moises subsequently removed items from the trunk of the Lumina and placed them in the trunk of the Altima. When a member of the surveillance team drove past the house, Moises quickly closed the trunk of the Altima. Police then followed Moises as he drove the Altima to the mobile home at 2299 North 37th Street. There, Moises removed from the

trunk two white plastic bags from the trunk of the car and carried them into the mobile home.

On November 20, 2002, at approximately 2 p.m., Miguel left the 1945 North 31st Street home and drove the Lumina to the mobile home at 2299 North 37th Street. Dailey testified that surveillance team members saw Miguel "messing around" with items inside a small storage shed located directly outside the front door of the trailer. Miguel then entered the mobile home. A short time later, he exited the mobile home carrying two white plastic bags that were consistent in appearance with the white plastic bags that Moises had carried into the mobile home the previous night. Miguel placed the bags in the passenger compartment of the Lumina.

After following Miguel for a while, the surveillance team conducted a traffic stop of Miguel's vehicle. He presented an Illinois driver's license in the name of Jose T. Cervantes with the address of 2295 North 37th Street. A search of the vehicle recovered a digital scale and approximately 54 pounds of cannabis in the compartment area and the trunk. Some of the cannabis was contained in a white plastic bag similar to the bags Moises and Miguel had carried, and the remainder was contained in a duffel bag. Police arrested Miguel and placed him in the backseat of a squad car to be transported to jail. After his arrival at the station, police searched the backseat of that squad car and discovered 7.7 grams of cocaine in the backseat.

During the arrest, officers asked Miguel where he resided. He initially responded that he resided in the mobile home located at 2299 North 37th Street. However, upon further questioning, he stated that he was Miguel Luna, that he lived at the 1945 North 31st Street home, and that he was the son of Moises Luna. Miguel had keys to both residences. Miguel admitted involvement in drug dealing.

Dailey further testified that, on the date of Miguel's arrest, police searched the 1945 North 31st Street house. They seized 2,400 grams of cocaine, packaging materials consistent with drug distribution, a handgun and ammunition, and various documents relating to Miguel. The above-mentioned Chevrolet pickup truck was in the garage of the residence. Miguel acknowledged that the truck belonged to him. Moreover, Tina Herrera, whose name was listed on the registration papers, told Dailey that the truck actually belonged to Miguel. She further revealed that: Miguel was having difficulty obtaining credit to buy a vehicle, Miguel chose the truck and gave her $5,000 cash to use as a down payment to purchase it, and Miguel gave her money to pay the $1,000 monthly payments on the truck.

On that same day, police also searched the mobile home located at 2299 North 37th Street. Dailey stated that prior to the commencement of the search, Moises arrived at the trailer driving the Nissan Altima. Dailey asked Moises whether he lived at the mobile home, and Moises responded that he did. Because Moises was not able to understand or speak English fluently, Dailey contacted a Spanish translator. Upon the translator's arrival, Dailey asked for Moises' consent to search the mobile home. Moises replied that he would allow the officers to search, but he was not responsible for anything in the trailer. Dailey responded that he could not provide any guarantees regarding responsibility for items found in the trailer. Moises consented to the search and completed the prescribed form. Inside the trailer, in the rear bedroom closet, police recovered approximately 180 grams of cannabis, a scale, and a handgun with ammunition. Included among the numerous documents recovered were titles to the Nissan Altima and the Chevrolet Lumina in the name of Jose T. Cervantes; two resident alien identification cards, both bearing photos of Miguel,

but one bearing the name of Miguel Luna and the other bearing the name of Jose T. Cervantes; and two social security cards, one bearing Miguel's name and the other bearing the name of Jose T. Cervantes. Inside the adjacent storage shed, police recovered a duffel bag containing packaging materials consistent with drug distribution.

In the ensuing police interview, Moises told police that he had been in Decatur for approximately seven or eight weeks. He was, at that time, employed at a tree farm, earning approximately $8.50 per hour. Moises planned to save money and eventually move his family from California to Decatur. He lived in the 2299 North 37th Street mobile home and was paying Miguel $260 per month in rent, although he was one month behind on the rent. Dailey testified that upon being shown Miguel's driver's license photograph, Moises at first denied that Miguel was his son. Instead, Moises told police that he was Miguel's uncle and that he had raised Miguel since Miguel was seven years old. Moises subsequently acknowledged that Miguel was his son.

Detective Dailey also interviewed Miguel's girlfriend, Elizabeth Kupish. At that time, she was residing at the 1945 North 31st Street residence with Miguel. Detective Dailey related the following statements of Kupish. Miguel had placed $40,000 down on the residence, but that it was in the name of his father and mother. Kupish believed that Miguel did this because he was a drug dealer and knew that if he was arrested the property would be seized. Similarly, Miguel also purchased Lots 214 and 215 for $6,500 cash and placed title in his parents' names.

Detective Dailey also testified to his formal training in drug trafficking and his experience, including more than 200 of his own drug investigations and hundreds of other drug investigations. Without objection, Dailey testi-

fied as an expert in the field of narcotic use and distribution. Dailey opined that it is common for people who distribute illegal narcotics to place their assets in the names of other people so that their properties would not be subject to seizure if they were arrested. Dailey also testified that those involved in the distribution of drugs commonly launder drug money by converting cash to money orders.

In furtherance of his investigation, Detective Dailey obtained bank records for accounts in the names of Jose T. Cervantes, Miguel Luna and Moises Luna. These records show that, on August 22, 2002, Moises opened an account at National City Bank with $8,000 in the form of 16 individual postal money orders—eight for $300 each and eight for $700 each. Moises subsequently made deposits into the National City account in the amounts of $10,500 and $3,500. Based on all of his testimony, Detective Dailey opined that Moises was also involved in drug dealing.

Both Moises and Ramona testified at the hearing through an interpreter. Both of them denied knowledge of Miguel's drug activities. Both of them also denied that Miguel ever provided them with money for the purchase of the real estate at issue.

Prior to his testimony, Moises was advised of his fifth amendment rights and he indicated that he understood them. Moises testified that he has been a legal resident of the United States for 15 years. He lived in California until August 2002. In California, he worked primarily as a migrant worker on fruit farms and also did landscaping. He rented an apartment in California and did not own property there. However, he did own property in Mexico. In June 2001, he sold a piece of property in Mexico for $35,000 and placed the proceeds in a safe-deposit box in Mexico. His wife also opened an account at Earthmover Credit Union in Decatur. In February 2002,

Moises gave Miguel a power of attorney to purchase the vacant lots 214 and 215 in Macon County. The record shows that the purchase price for the two lots was approximately $6,500.

In August 2002, Moises moved from California to Decatur. Moises came to Decatur by himself. At the time of Miguel's arrest, Ramona continued to reside in California. Upon his arrival, Moises lived at the 2299 North 37th Street mobile home with Miguel and Kupish. In November 2002, Moises returned to Mexico, retrieved his $35,000, and deposited it at National City Bank in Decatur. He also received two personal loans of $4,000 and $8,000 from his daughter and niece, respectively, which he deposited in the National City account. Claimants then purchased the 1945 North 31st Street house. Their down payment consisted of a $22,000 check drawn on the National City account and a $17,000 check drawn on Ramona's Earthmover Credit Union account. Also, claimants secured a mortgage from Prairie State Bank and Trust for approximately $22,993. According to Moises, these three financial instruments add up to the purchase price of approximately $62,000. Moises denied receiving money from Miguel for the purchase of the vacant lots or the house.

After Moises purchased the 1945 North 31st Street house, he allowed Miguel and Kupish to move into the house. Moises explained that Kupish was pregnant, was expected to soon give birth, and the mobile home was not big enough for them and a baby. Miguel and Kupish moved into the house approximately one week prior to Miguel's arrest. Miguel had keys to the trailer and had access thereto when Moises was absent.

Moises admitted that on the night of November 19, 2002, he backed the Nissan Altima into the driveway of the house, such that it was back-to-back with the Chevrolet Lumina. He did so because he was picking up bread

and Miguel's dog, which liked to enter the Altima through its open hatchback. According to Moises, this was the only way the dog would cross over to the other vehicle. Claimants also introduced into evidence two white paper bags. The bags contained bread and were the actual bags he had carried into the mobile home on November 19, 2002. The bread bags were on his table when police searched the mobile home on November 20, 2002.

Moises stated that he had no knowledge of the cannabis and other items police found in the rear bedroom closet of the mobile home. He had always slept in the living room of the mobile home. He continued to do so after Miguel and Kupish moved into the house because he could watch television.

In her testimony, Ramona stated that she cannot read English or Spanish. She had lived in California for 14 or 15 years. She had worked for Home Depot, selecting and selling plants. She moved to Decatur approximately one month prior to her testimony and resided with Moises in the 1945 North 31st Street house. She and Moises owned a house in Mexico, and they sold that house. However, she did not remember how much they received for it. Ramona corroborated Moises' testimony concerning the source of the funds for the purchase of the house and the vacant lots. Ramona denied that Miguel gave them money to buy the properties. Ramona, was also unaware that Miguel was ever involved in possessing or distributing drugs.

At the time of the hearing, claimants and their children were living in, and making mortgage payments on, the 1945 North 31st Street house. Claimants introduced into evidence the contract for the sale of the property in Mexico, both in the original Spanish and translated into English. The contract indicates a sale date of June 9, 2001, and a sale price of $35,000 in United States currency.

Claimants also called Kupish to testify as an adverse witness in their case in chief. After preliminary questions, Kupish stated that she was facing criminal charges regarding these events. She invoked her fifth amendment (U.S. Const., amend. V) rights precluding further questioning. In the State's rebuttal case Decatur police Sergeant McElroy, a member of the surveillance team, testified that Moises' Nissan Altima was not a hatchback vehicle, but rather was a midsize, four-door vehicle with a regular trunk. On the night of November 19, 2002, Sergeant McElroy did not see any dog with Moises when he went into the mobile home. Also, the white bags that Sergeant McElroy saw Moises carry were not the bread bags that Moises introduced into evidence. At the close of all the evidence, the circuit court took the matter under advisement.

The docket sheet reflects that on July 29, 2003, the circuit court entered the following findings. First, the circuit court found that the State established probable cause that the real estate at issue was subject to forfeiture under the Cannabis Control Act or the Illinois Controlled Substances Act. The court further noted that Moises had not established by a preponderance of the evidence that the real estate was not subject to forfeiture or that it was exempt from forfeiture. The court, therefore, ordered that the interest of Moises in the three pieces of property be forfeited to the State. On August 7, 2003, the court entered a written forfeiture order memorializing these findings.

By its terms, however, the original order forfeited only Moises' interest in the real estate. The State filed a motion for an amended forfeiture order, and claimants filed a motion for reconsideration. The docket sheet reflects that on September 24, 2003, the circuit court entered the following additional findings. The court, in finding that the State established a *prima facie* case, did

not rely on any of the presumptions allowed under section 7 of the Forfeiture Act (725 ILCS 150/7 (West 2002)).[1] The court found that the homestead exemption does not apply to a forfeiture case (see 735 ILCS 5/12—903.5 (West 2002)). Continuing its findings, the circuit court also found that the three parcels of real estate were held by claimants only as nominees of Miguel, whose conduct gave rise to its forfeiture and whose illegal drug sales activities were the source of most, if not all, of the cash invested. The court also found that Moises participated in part in Miguel's illegal drug sales activities by transporting some drugs from one location to another. The circuit court also found claimants' "explanation and evidence not credible and not sufficient to overcome the State's prima facie case." The circuit court found that the evidence did not establish Ramona was involved in Miguel's drug dealing. However, the circuit court found that the evidence did establish that Ramona stood to acquire substantial proceeds from Miguel's conduct and that Ramona held the property for the benefit of or as nominee for Miguel. On October 1, 2003, the circuit court entered an amended order that forfeited the interests of Miguel and claimants in the real estate.

On appeal, a divided appellate court affirmed the forfeiture order of the circuit court. No. 4—03—0917 (unpublished order under Supreme Court Rule 23). The appellate court majority concluded that the State satisfied its burden of demonstrating the existence of probable cause for the forfeitures in question. The majority further concluded that claimants failed to meet their burden of establishing by a preponderance of the evidence that the properties were not purchased with the proceeds

---

[1]Although the circuit court cited section 9 of the Forfeiture Act ("Judicial in rem procedures") (725 ILCS 150/9 (West 2002)), we presume that the court meant to cite to section 7 of the Act ("Presumptions").

of illegal drug activities. Justice Appleton dissented, reasoning *in toto*:

> "In opposition to the State's assertion that the properties sought to be forfeited were purchased with the proceeds of Miguel's illegal drug activity, Moises and Ramona produced evidence of the source of the funds used by them to acquire the properties. This evidence was not rebutted by the State. I would agree that the manner of funding these transactions does not comport with standard business practices but given the language and cultural differences demonstrated by the Lunas, such a deviation cannot be assumed to be unworthy of belief."

Justice Appleton would have reversed the circuit court's forfeiture order as being against the manifest weight of the evidence.

Claimants appeal to this court (177 Ill. 2d R. 315(a)). Additional pertinent background will be discussed in the context of our analysis of the issues.

## ANALYSIS

We preface our discussion of the issues raised in this cause with a brief review of the forfeiture procedure set forth in the Forfeiture Act. Our General Assembly has expressly found that civil forfeiture has a significant beneficial effect in deterring the rising incidence of the abuse and trafficking of substances prohibited by the Illinois Controlled Substances Act (720 ILCS 570/100 *et seq.* (West 2002)) and the Cannabis Control Act (720 ILCS 550/1 *et seq.* (West 2002)). 725 ILCS 150/2 (West 2002). We note that claimants began oral argument in this cause by stating that forfeitures are not favored in the law and "therefore, we must construe the forfeiture statute strictly." Courts have, of course, "stated that as a general rule forfeitures are disfavored at law and that statutes authorizing them must be construed strictly in a manner as favorable to the person whose property is seized as is consistent with fair principles of statutory interpretation." *People v. United States Currency $3,108,*

219 Ill. App. 3d 441, 446 (1991) (interpreting Controlled Substances Act); see *People v. One 1986 White Mazda Pickup Truck*, 251 Ill. App. 3d 79, 83 (1993) (same). However, against this backdrop, the General Assembly has declared its intent that the provisions of the Forfeiture Act "be liberally construed so as to effect their remedial purpose." 725 ILCS 150/13 (West 2002).

The General Assembly also expressly found that the federal narcotics civil forfeiture statute "has been very successful in deterring the use and distribution of controlled substances within this State and throughout the country." 725 ILCS 150/2 (West 2002). Therefore, the General Assembly based the Forfeiture Act on the federal civil forfeiture statute and expressly declared its intent "that the forfeiture provisions of this Act be construed in light of the federal forfeiture provisions contained in 21 U.S.C. 881 as interpreted by the federal courts, except to the extent that the provisions of this Act expressly differ therefrom." 725 ILCS 150/2 (West 2002). See *People ex rel. Devine v. $30,700.00 United States Currency*, 199 Ill. 2d 142, 149 (2002); *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill. 2d 314, 325-26 (1997).

If the State seizes real property, the Forfeiture Act provides for a judicial *in rem* procedure. 725 ILCS 150/9 (West 2002). The State brings the action against seized property pursuant to the legal fiction that the property itself is guilty of facilitating a crime. See *United States v. Property at Route 1, Box 137, Randolph*, 743 F. Supp. 802, 804 (M.D. Ala. 1990); *United States v. One Rural Lot*, 739 F. Supp. 74, 77 (D. Puerto Rico 1990). The State's Attorney initiates the action by filing a verified complaint for forfeiture. 725 ILCS 150/9(A) (West 2002). Only an owner or interest holder may file an answer asserting a claim against the property. 725 ILCS 150/9(C) (West 2002). The answer must contain certain informa-

tion, including the circumstances surrounding the claimant's acquisition of the property. 725 ILCS 150/9(D) (West 2002).

In a proceeding under the Forfeiture Act, the State has the initial burden of showing the existence of probable cause for forfeiture of the property. 725 ILCS 150/9(G) (West 2002). When the State satisfies its burden of establishing probable cause, the burden shifts to the claimant to show by a preponderance of the evidence that the property is not subject to forfeiture. 725 ILCS 150/9(G) (West 2002). A claimant may satisfy this burden by establishing one of the innocent-owner defenses provided in section 8 of the Forfeiture Act. 725 ILCS 150/8 (West 2002). "If the State does show existence of probable cause and the claimant does not establish by a preponderance of the evidence that the claimant has an interest that is exempt under Section 8 of this Act, the court shall order all property forfeited to the State." 725 ILCS 150/9(H) (West 2002). With these principles in mind, we turn to claimants' contentions.

### I. Statutory Exemption

Claimants first observe that they hold title to the 1945 North 31st Street property as tenants by the entirety. They also point to the circuit court's additional finding that the evidence did not establish that Ramona was legally accountable for the conduct giving rise to the forfeiture, or that she solicited, conspired, or attempted to commit the conduct giving rise to the forfeiture. Because the circuit court found Ramona to be an innocent spouse, claimants contend that she qualifies as an innocent owner under section 8 of the Forfeiture Act. Therefore, according to claimants, the 1945 North 31st Street residence "was exempt from forfeiture when Ramona was found to be an innocent spouse."

To resolve this issue, we turn to section 8 of the Forfeiture Act, which provides for innocent-owner

defenses. 725 ILCS 150/8 (West 2002). The controlling principles are familiar.

"The cardinal rule of statutory construction is to ascertain and give effect to the true intent of the legislature. [Citation.] The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning. [Citations.] The statute should be evaluated as a whole, with each provision construed in connection with every other section. [Citation.] If legislative intent can be ascertained from the statute's plain language, that intent must prevail without resort to other interpretive aids." *Paris v. Feder*, 179 Ill. 2d 173, 177 (1997).

Because the interpretation of a statute is a question of law, our review is *de novo. Petersen v. Wallach*, 198 Ill. 2d 439, 444 (2002); *In re Estate of Dierkes*, 191 Ill. 2d 326, 330 (2000).

Section 8 of the Forfeiture Act provides in pertinent part:

"§ 8. Exemptions from forfeiture. A property interest is exempt from forfeiture under this Section if its owner or interest holder establishes by a preponderance of evidence that the owner or interest holder:

(A)(i) ***

(ii) in the case of real property, is not legally accountable for the conduct giving rise to the forfeiture, or did not solicit, conspire, or attempt to commit the conduct giving rise to the forfeiture; *and*

(B) had not acquired and did not stand to acquire substantial proceeds from the conduct giving rise to its forfeiture other than as an interest holder in an arm's length commercial transaction; *and*
***

(D) does not hold the property for the benefit of or as nominee for any person whose conduct gave rise to its forfeiture, and, if the owner or interest holder acquired the interest through any such person, the owner or interest holder acquired it as a bona fide purchaser for value without knowingly taking part in the conduct giving rise to the forfeiture; *and*

(E) that the owner or interest holder acquired the interest:

(i) before the commencement of the conduct giving rise to its forfeiture and the person whose conduct gave rise to its forfeiture did not have the authority to convey the interest to a bona fide purchaser for value at the time of the conduct; ***

(ii) *** *and*
***

(b) in the case of real estate, before the filing in the office of the Recorder of Deeds of the county in which the real estate is located of a notice of seizure for forfeiture or a lis pendens notice." (Emphases added.) 725 ILCS 150/8 (West 2002).

If the claimant fails to establish an interest in the subject property that is exempt under section 8, the circuit court shall order the property forfeited to the State. 725 ILCS 150/9(H) (West 2002).

During oral argument, claimants noted that the circuit court found that Ramona satisfied section 8(A)(ii), *i.e.*, she was not involved in Miguel's drug dealing. We agree. However, claimants posited that this finding, by itself, "takes precedence" over the remaining conditions of section 8. Indeed, according to claimants: "That's where the appellate court got hung up." Claimants argued that the appellate court erred in applying all of the pertinent conditions of section 8 to Ramona's interest in the residence. Claimants argued that the other conditions of section 8 do not "override" Ramona's "actual innocence."

This contention lacks merit. The pertinent conditions of section 8 are plainly joined with the term "and." This court long ago observed the obvious: "The conjunction 'and' *** signifies and expresses the relation of addition." *City of LaSalle v. Kostka*, 190 Ill. 130, 137 (1901). Of course, the word "and" is sometimes considered to mean "or," and vice versa, in the interpretation of statutes. However, "[t]his is not done except in cases

where there is an apparent repugnance or inconsistency in a statute that would defeat its main intent and purpose. When these words are found in a statute and their accurate reading does not render the sense dubious they should be read and interpreted as written in the statute." *Voight v. Industrial Comm'n*, 297 Ill. 109, 114 (1921). " 'As a general rule, the use of the conjunctive, as in the word "and," indicates that the legislature intended for *all* of the listed requirements to be met. [Citations.]' (Emphasis in original.)" *Byung Moo Soh v. Target Marketing Systems, Inc.*, 353 Ill. App. 3d 126, 131 (2004), quoting *Gilchrist v. Human Rights Comm'n*, 312 Ill. App. 3d 597, 602 (2000).

In this case, the court found:

> "The evidence does not establish that Ramona DeLuna is legally accountable for the conduct giving rise to the forfeiture or that she solicited, conspired or attempted to commit the conduct giving rise to the forfeiture, but does establish that she stood to acquire substantial proceeds from the conduct other than as an interest holder in an arm[']s[-]length commercial transaction and that she held the property for the benefit of or as nominee for Miguel DeLuna."

Thus, the circuit court found that Ramona had satisfied section 8(A)(ii), but had failed to satisfy section 8(B) or 8(D). Because Ramona was unable to satisfy all of the pertinent conditions of section 8, she was not an "innocent owner," within the meaning of the Forfeiture Act, and the circuit court properly ordered the 1945 North 31st Street residence forfeited to the State. See, *e.g.*, *People ex rel. Birkett v. 1998 Chevrolet Corvette*, 331 Ill. App. 3d 453, 463 (2002) (concluding that the claimant "did not prove by a preponderance of the evidence that he qualified as an innocent owner" because he did not satisfy all of the pertinent conditions of section 8); *People v. 1515 Coolidge Avenue*, 308 Ill. App. 3d 805, 812 (1999) (concluding that the claimant failed to satisfy section 8(D) and, consequently, the property was subject to

forfeiture, where the claimant held the real estate for the benefit of another, who purchased it with proceeds from drug dealing). Because Ramona is not an "innocent owner" under section 8 of the Act, this case does not present—and we expressly do not discuss—the issue of whether property is subject to forfeiture where an innocent spouse pursuant to section 8 of the Act holds title to the subject property together with his or her spouse as tenants by the entirety. See *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 157 (2002) (noting that advisory opinions are to be avoided).

## II. Sufficiency of the Evidence

Claimants next challenge the sufficiency of the evidence. They first maintain that the State failed to establish probable cause for forfeiture of the three parcels of property. Claimants further maintain that, if this court should hold that the State established probable cause, they, "by a preponderance of the evidence, overcame the proof of the State and demonstrated the true source of the funds for the purchase" of the real estate. We disagree.

### A. *State's Case in Chief*

Claimants' sufficiency of the evidence challenge to the circuit court's finding of probable cause begins with a question regarding the admissibility of Detective Dailey's testimony concerning Kupish's out-of-court statements. As earlier noted, Dailey testified during the State's case in chief that Kupish told him that Miguel had placed $40,000 down for the purchase of the single-family residence, had paid $6,500 cash for Lots 214 and 215, and had placed title to these properties in his parents' names. Dailey testified that Kupish told him that she believed Miguel did this because he was a drug dealer and knew that if he should be arrested, this property would be seized. Claimants point out that they

tried to refute this testimony by calling Kupish to testify, but that she invoked her fifth amendment rights, precluding further questioning. Claimants maintain, now for the first time in the course of these proceedings, that the circuit court, *sua sponte*, should have stricken from the record Dailey's earlier testimony regarding Kupish's statement, and that without the benefit of Kupish's out-of-court statement, the State's case in chief fails. In support of this contention, claimants cite to *Lee v. Police Board*, 72 Ill. App. 2d 134 (1966), for the proposition that where a witness, in this case, an out-of-court statement by a nonwitness, refuses to submit to cross-examination, the witness' entire testimony should be stricken. However, we express no opinion as to the application of this principle to the circumstances present here because claimants did not properly preserve the issue and, as a result, it is not properly before us.

The record reveals that when Kupish refused to be questioned regarding her hearsay statement introduced as part of the State's case in chief, claimants neither objected to Dailey's earlier testimony regarding Kupish's hearsay statement nor moved to strike it from the record. "An issue not presented to the trial court is waived in nonjury civil cases." *Chandler v. Doherty*, 299 Ill. App. 3d 797, 806 (1998); see, *e.g.*, *In re Marriage of Winters*, 160 Ill. App. 3d 277, 280 (1987) (holding that failure to object to admission of evidence *in bench trial* resulted in procedural default of the issue for review); *Wanland v. Beavers*, 130 Ill. App. 3d 731, 734 (1985) (same); *Illinois State Trust Co. v. Southern Illinois National Bank*, 29 Ill. App. 3d 1, 11 (1975) (same); *Hill v. Meister*, 133 Ill. App. 2d 678, 682 (1971) (same). "No duty rests upon the court to rule out evidence to which there might be some objection; making appropriate objections is the function of the party opposing its admission." *Hill*, 133 Ill. App. 2d at 682. If a party wishes to challenge the admissibility of

testimony, it is that party's duty to object in apt time to obtain a ruling by the trial court. "Failure to object must be considered as a waiver of the objection." *Wanland*, 130 Ill. App. 3d at 734; see, *e.g.*, *Snelson v. Kamm*, 204 Ill. 2d 1, 34 (2003) (holding that any valid objection the defendant may have had for admission of evidence "was waived by his failure to make specific contemporary objections at trial so that any defect could have been cured"); *Winters*, 160 Ill. App. 3d at 280 (same).

Claimants suggest that their procedural default is irrelevant here because of the fact that this was a bench trial. Claimants cite *People v. Soteras*, 295 Ill. App. 3d 610 (1998), for the proposition that, in a bench trial, the trial judge is presumed to consider only admissible evidence. However, this presumption has never been used by a court as a means of excusing a party from the type of procedural default at issue here; indeed, in the absence of such an objection, an issue, even in a criminal bench trial, has been consistently deemed procedurally defaulted. See, *e.g.*, *People v. Pelegri*, 39 Ill. 2d 568, 574-75 (1968); *People v. French*, 33 Ill. 2d 146, 149-50 (1965).

Accordingly, the circuit court properly included Detective Dailey's testimony regarding Kupish's hearsay statement as part of the State's case in chief. "It is well established that when hearsay evidence is admitted without an objection, it is to be considered and given its natural probative effect." *Jackson v. Board of Review of the Department of Labor*, 105 Ill. 2d 501, 508-09 (1985) (collecting authorities; observing that "the overwhelming weight of authority supports" rule); *King v. Ashbrook*, 313 Ill. App. 3d 1040, 1045 (2000) (applying rule in bench trial); *Buckingham Corp. v. Ewing Liquors Co.*, 15 Ill. App. 3d 839, 843 (1973) (same; describing rule as "elementary"). Having held that Kupish's out-of-court statement was properly considered by the court, we necessarily reject any contention that its absence should

have caused the State's case to fall. We turn now to assessing the sufficiency of the totality of the State's case in chief.

To satisfy the probable cause requirement under the Forfeiture Act, a complaint for forfeiture must allege facts providing reasonable grounds for the belief that there exists a nexus between the property and illegal drug activity, supported by less than *prima facie* proof but more than mere suspicion. See *$1,124,905 U.S. Currency*, 177 Ill. 2d at 336-38. Probable cause in this context requires only a probability or substantial chance of the nexus and not an actual showing. See *United States v. Certain Real Property*, 943 F.2d 721, 725 (7th Cir. 1991), quoting *United States v. Edwards*, 885 F.2d 377, 390 (7th Cir. 1989); *United States v. $364,960.00 in United States Currency*, 661 F.2d 319, 324 (5th Cir. 1981) ("Evidence sufficient to shift the burden to claimants in a forfeiture proceeding need not provide conclusive proof, however, but rather a reasonable ground for belief"). Also, the government's evidence need not exclude other plausible hypotheses of the source of the money used to purchase the subject property. *United States v. One Parcel of Real Property*, 921 F.2d 370, 377 (1st Cir. 1990), citing *United States v. $250,000*, 808 F.2d 895, 899 (1st Cir. 1987); *$364,960*, 661 F.2d at 324. Further, "it is the totality of the circumstances, not a minute parsing of each item of information, that leads to a finding of probable cause." *United States v. One 1987 Mercedes 560 SEL*, 919 F.2d 327, 331 (5th Cir. 1990); accord *Edwards*, 885 F.2d at 390. During the probable cause portion of the proceeding, "the court must receive and consider, among other things, all relevant hearsay evidence and information." During all other portions of the proceeding, the law of evidence relating to civil actions applies. 725 ILCS 150/9(B) (West 2002).

The record in this case supports the circuit court's

finding of probable cause. It is undisputed that Miguel was actively involved in drug activities and that the police discovered large quantities of cocaine from the 1945 North 31st Street house and cannabis from the 2299 North 37th Street mobile home. The State presented evidence, through the testimony of two officers, that Moises was involved in Miguel's drug dealing on at least one occasion, when Moises transported the drugs for Miguel on November 19, 2002. Detective Dailey testified at the hearing as an expert witness in the field of narcotics use and distribution. He explained that it is common for drug dealers to place their assets in the names of other people so that their properties would not be subject to forfeiture if they were to be arrested. He also explained that converting cash into a postal money order, which was how Moises initially deposited money into his Decatur bank account, is a common way for drug dealers to launder money.

Also, claimants note that Detective Dailey referred to People's Exhibit No. 1 in his testimony. Detective Dailey described the exhibit as a time line containing a brief summary of account activities in claimants' bank accounts. It also includes information regarding the real estate transactions, money orders, and wire transfers made by claimants in this case. Claimants contend that the exhibit was never offered into evidence and cannot be considered as proof in this case. Claimants point to a form on the last page of the common law record that lists the exhibit and shows a check mark in a box that indicates identification, but an adjacent box that indicates admission into evidence is blank. However, as reflected in the report of proceedings for June 23, 2003, at the close of claimants' case, a colloquy between the court, the prosecutor, and counsel for claimants clearly indicates that claimants viewed the exhibit as already having been admitted into evidence. Due to the sporadic nature of the

trial, the court could not remember whether all of the exhibits had been admitted into evidence. The court suggested that both sides present their exhibits for admission. After ruling on claimants' exhibits, the court asked counsel for claimants whether there were any other exhibits the admissibility of which the court had not yet ruled upon. Counsel responded: "I believe that's it, Your Honor. The only one here is the People's exhibit and that's been taken care of." Claimants may not now attack a procedure to which they agreed. See *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004) (holding that party cannot complain of error to which that party consented).

After reviewing all of the State's evidence, we conclude that the State demonstrated reasonable grounds for the belief that there exists a connection between the subject property and Miguel's illegal drug activity. We observe that the circuit court was sitting without a jury.

"In a bench trial, the trial court must weigh the evidence and make findings of fact. In close cases, where findings of fact depend on the credibility of witnesses, it is particularly true that a reviewing court will defer to the findings of the trial court unless they are against the manifest weight of the evidence. *Chicago Investment Corp. v. Dolins*, 107 Ill. 2d 120, 124 (1985). *** A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 242 (1996); *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 106 (1995); *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995). 'The court on review must not substitute its judgment for that of the trier of fact.' *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 434 (1991)." *Eychaner v. Gross*, 202 Ill. 2d 228, 251-52 (2002).

Specifically, in a forfeiture case, the circuit court, as the trier of fact, determines the credibility of the witnesses and evaluates their testimony. Also, the court may draw

reasonable inferences and reach conclusions to which the evidence lends itself. Because the circuit court bases its conclusion upon its assessment of the evidence, a reviewing court will not reverse an order of forfeiture unless it is against the manifest weight of the evidence. *1998 Chevrolet Corvette*, 331 Ill. App. 3d at 459; *People v. $5,970 United States Currency*, 279 Ill. App. 3d 583, 588 (1996); *People v. $52,204.00 United States Currency*, 252 Ill. App. 3d 778, 782-83 (1993). We cannot say that the circuit court's finding of probable cause was against the manifest weight of the evidence.[2]

### B. *Claimants' Case*

Alternatively, claimants contend that they established by a preponderance of the evidence that the subject property was exempt from forfeiture. They argue that the property was not purchased by proceeds from illegal drug activities.

Both the 1945 North 31st Street house and the vacant lots were titled to claimants. Regarding the purchase of the vacant lots, Moises testified that he and Ramona purchased the lots before he moved to Decatur. Miguel executed the transaction and purchased the lots with cash. Claimants assert that they did not yet have a bank account in Decatur at the time of the purchase. However, claimants did not present evidence that would confirm that they supplied Miguel with the cash for the purchase.

---

[2]We note that some federal courts of appeals view the probable cause determination in a forfeiture proceeding as a question of law subject to *de novo* review. See, *e.g.*, *United States v. $250,000 in United States Currency*, 808 F.2d 895, 898 n.6 (1st Cir. 1987) (collecting cases). However, other federal courts of appeals view the issue as a mixed question of fact and law: the district court's factual findings are accorded deference, but the probable cause determination itself is subject to *de novo* review. *United States v. $39,873.00*, 80 F.3d 317, 318 (8th Cir. 1996). The parties have neither briefed nor argued this issue and we do not address it.

Regarding the purchase of the 1945 North 31st Street residence, Moises explained that he purchased the house with a mortgage, proceeds from his sale of real estate in Mexico, and personal loans from family members. Claimants assert that the amounts from these sources total the purchase price of the house. However, we agree with the appellate court that, despite all of the above evidence, claimants were not able to show that the money they had in their accounts did not come from Miguel, even though claimants were the ones who had exclusive control of their own financial information.

In this case, the circuit court evaluated claimants' evidence and assessed claimants' credibility. Based on its evaluation and assessment, the court found that claimants failed to prove by a preponderance of the evidence that the purchase money for the subject property did not come from Miguel based on: (1) the State's nonhearsay testimony that Miguel had a pattern of placing titles to the properties that he actually owns in the name of other persons, and that Moises was involved in at least one illegal drug activity with Miguel; (2) inconsistencies in claimants' testimony; and (3) claimants' failure to demonstrate the original source of the funds.

We note that the appellate court dissent concluded that claimants "produced evidence of the source of the funds used by them to acquire the properties." It is true that the record contains *some* evidence that supports claimants' position. However, the circuit court expressly found that claimants' explanation and evidence were not credible and not sufficient to overcome the State's *prima facie* case. It must be remembered that it was the circuit court who saw the witnesses and heard them testify. " 'It is axiomatic that a reviewing court may not reweigh the evidence or substitute its judgment for that of the trier of fact. Findings of fact are entitled to deference, and this is particularly true of credibility determinations.' "

*Eychaner*, 202 Ill. 2d at 270, quoting *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 180 (1989); accord *Chicago Investment Corp. v. Dolins*, 107 Ill. 2d 120, 129 (1985). Courts recognize that the trial judge, as the trier of fact, is in a superior position to the reviewing court to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh and determine the preponderance of the evidence. See, *e.g.*, *1998 Chevrolet Corvette*, 331 Ill. App. 3d at 459 (observing that trial court "is best suited to evaluate" testimony of witnesses and to draw reasonable inferences therefrom); *People v. One 1982 Maroon Ford Mustang*, 258 Ill. App. 3d 127, 132 (1994) (same). A reviewing court may not overturn a judgment merely because the reviewing court might disagree with the judgment, or, had the reviewing court been the trier of fact, might have come to a different conclusion. *Eychaner*, 202 Ill. 2d at 270-71 (and cases cited therein). After reviewing the entire record, we cannot say that the circuit court's findings and determination were against the manifest weight of the evidence. Accordingly, we uphold the forfeiture order of the circuit court.

## CONCLUSION
For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed.*