NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 250139-U

NO. 4-25-0139

IN THE APPELLATE COURT

FILED
December 12, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| RESIDENCE AT 1303 RONCEVALLES AVENUE, | ) | No. 24MR10 |
| Defendant | ) | |
| (Roberta Devoll, Claimant-Appellant). | ) | Honorable |
| | ) | Ronald A. Barch, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Zenoff and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The trial court's finding that the real property in question was forfeitable pursuant to statute was not against the manifest weight of the evidence but (2) on *de novo* review, forfeiture constitutes an unconstitutional excessive fine.

¶ 2    Claimant Roberta Devoll appeals the trial court's order granting the State's complaint seeking civil forfeiture of residential property at 1303 Roncevalles Avenue in Rockford, Illinois (Roncevalles property). The Roncevalles property was forfeited based on the court's finding that Kyle Johnson, Devoll's son and the sole resident of the premises, conducted a large-scale illegal drug operation using several properties, including the Roncevalles property and another property leased by Devoll located at 2204 23rd Street in Rockford (23rd Street property). The court found that Devoll knew of and assisted Johnson's illegal activity in several respects, making the Roncevalles property forfeitable. The court also found that forfeiture was not an excessive fine in violation of the eighth amendment to the United States Constitution (U.S. Const.,

amend. VIII) or the Drug Asset Forfeiture Procedure Act (Forfeiture Act) (725 ILCS 150/1 *et seq.* (West 2024)).

¶ 3        Devoll now appeals. For the reasons expressed below, we reverse.

¶ 4                              I. BACKGROUND

¶ 5        In January 2024, the State filed a request seeking preliminary review of probable cause for civil forfeiture of the Roncevalles property. The trial court found probable cause, and the State filed its complaint for forfeiture. Devoll filed an answer asserting that she had no knowledge the Roncevalles property was used for illegal activity.

¶ 6        The matter proceeded to an *in rem* proceeding. At the outset of the hearing, Devoll initially challenged the preliminary probable cause finding made earlier because the State had relied on a statutory provision applicable to only personal property in its pleadings. The State argued that its complaint also cited the Forfeiture Act. The trial court found the probable cause finding made earlier was actually unnecessary under the Forfeiture Act, as there had been no prehearing seizure of the real estate. See 725 ILCS 150/3.5 (West 2024) (providing for preliminary review within 14 days of seizure). Additionally, Devoll's counsel acknowledged he had not filed a motion seeking an innocent owner hearing under the Forfeiture Act (*id.* § 9.1). The court noted the lack of a motion and stated Devoll could still argue she was an innocent owner, but there would not be a special preliminary hearing on the matter.

¶ 7        With the foregoing preliminary matters resolved, the State began presentation of its case. Rockford police detective Michael Jury testified that his investigation into Johnson began when police received a complaint from a concerned citizen that large amounts of narcotics were being sold, and firearms were stored, at the 23rd Street property. After a search of trash at the 23rd Street property revealed evidence of possession of cannabis with intent to deliver, investigators

obtained a search warrant for that address. Inside, investigators found just under 400 pounds of cannabis and cannabis products, including edible candies that were labeled as tetrahydrocannabinol (THC) and about 96 pounds of THC juices in clear plastic bottles. There was also green cannabis, cocaine, fentanyl, and about 200 gross grams (*i.e.*, weight inclusive of packaging) of Psilocybin mushrooms. Also found was documentation bearing Devoll's name and the address of the Roncevalles property. Jury opined that the 23rd Street property was "a narcotics stash house" and was "used to stash drugs and firearms for the purpose of sale." When asked if there was anything indicating people were living there, Jury said there was some men's clothing found there. Jury learned that Devoll leased the 23rd Street property.

¶ 8        Jury testified that, in November 2023, police executed a traffic stop on Johnson's vehicle. In his possession were 78 blue fentanyl pills, cannabis, cash, and two phones. Search warrants were obtained for the phones, leading to the recovery of text messages between Johnson and Devoll. Based on the text messages, investigators believed Johnson was also using the Roncevalles property to sell narcotics. Jury also testified there were other phone messages in which Johnson directed people to the Roncevalles property to get drugs. Based on this information, investigators obtained a search warrant for the Roncevalles property.

¶ 9        Jury testified that a search warrant was executed at the Roncevalles property on January 10, 2024; no one was home at the time. He described what was found as follows:

> "[W]e found multiple items of packaging material. There was a bedroom in the
> residence that was specifically for packaging material, just piles of it. There was a
> firearm located in the bedroom. There was multiple documentations in the name of
> [Johnson] of mail. There was mail in the name of [Devoll]. There was
> approximately $500, I believe, in the bedroom, and then a bunch of cannabis wax

- 3 -

and cannabis products as well."

¶ 10    The record contains an exhibit providing more detail concerning the nature and quantity of what was found during the search of the Roncevalles property, but that document was used only to refresh Jury's recollection; it was not entered into evidence.

¶ 11    When asked what Johnson was charged with, Jury stated,

"A lot of charges, but everything from 23rd Street that we recovered, possession with intent to deliver over 900 gross grams of cocaine, possession with intent to deliver cannabis, and then unlawful use of a weapon by a felon."

¶ 12    Jury testified that Johnson later pleaded guilty to the charges. However, in its order, the trial court noted Johnson was charged based solely on items found at the 23rd Street property in Winnebago County case Nos. 24-CF-522 and 24-CF-523. Another case, Winnebago County case No. 24-CF-516, related to items found on Johnson when he was arrested at a third property. The court stated that Johnson resolved the multiple charges pending against him in case Nos. 24-CF-516, 24-CF-521, 24-CF-522, and 24-CF-523 by pleading guilty to a single Class X felony charge of possession of cocaine with intent to deliver in exchange for dismissal of the remaining charges. Nothing in the record shows Johnson was specifically charged or convicted based on items found at the Roncevalles property. Inmate records of the Illinois Department of Corrections show Johnson is serving a 25-year sentence in case No. 24-CF-516.

¶ 13    Jury testified he believed Devoll was aware of Johnson's drug operation because of text messages between Johnson and Devoll. The most relevant text messages involving Devoll were as follows:

8/3/23, Johnson:    "What's up with Llc? I'm trying to get my business put on google and my boy is gonna make web page?"

"Please help me get this done"

8/3/23, Devoll: "Yes. I will call it. Today"

"Please go to bank today."

8/3/23, Johnson: "I will sorry I was making carts till seven pm last night me and ginger I wasn't trying not to just got lost in work."

8/3/23, Devoll: "K babe"

8/6/23, Johnson: "Website is getting set up for my personal training business Were we at on Llc? Can we pleas get this done probation is looking into my stuff heavy since I git charge for hustling. Now. What do we gotta do to get it done?"

"They won't have one reason they can fuck with me if I'm all set up with this"

8/7/23, Johnson: "3500 is in ur account"

8/7/23, Devoll: "Ok thanks babe"

8/13/23, Johnson: "Did we get ein number yet for Llc? It's the last thing I need to complete the website"

8/13/23, Devoll: "Just checked. Not seeing anything yet"

8/17/23, Devoll: "Venmo 1500 is done."

"Adam text me that he received it"

8/18/23, Devoll: "Look in your pockets."

| | |
|---|---|
| 8/20/23, Devoll: | "Just got text, bottles will be there Monday!" |
| 8/21/23, Devoll: | "Bottles were delivered. R u back" |
| 8/22/ 23, Devoll: | "Let me know when u go to the bank." |
| 8/22/23, Johnson: | "4250 takes care of Bills 1500 Plastic bottles" |

"Can't send money like this ever agai. The compute is forcing teller to ask wha ti do for a living because of the amounts"

| | |
|---|---|
| 8/22/23, Devoll: | "What the heck" |
| 8/22/23, Johnson: | "Means feds r looking at that and I'm already unde investigation" |

"Under"

| | |
|---|---|
| 8/22/23, Devoll: | "Oh my…" |
| 8/22/23, Johnson: | "I'm getting scared I need to find a place no one knows about to live since my house was compromised with how license plate was done." |

"As long as I don't get caught with bunch of stuff agai.n I'm gonna be find because of all the stuff I done to show I have business they won't mess with me cuz if that if I don't get caught with anything or give them a chance to event catch me with anything."

"I don't see them letting me keep doing what I just got back from doing. At most they would let me do that once

if they were watching hard and the use that to lock me up so idk what to think if they r watching their not watching hard idk"

| | |
|---|---|
| 8/23/23, Devoll: | "Call ya in a lil bit" |
| 8/24/23, Devoll: | "Should I use: [another phone number]" |
| 8/24/23, Johnson: | "Yes" |
| 9/5/23, Johnson: | "Pleas get liscnese plate stuff finished. I don't want this addy in thier" |
| 9/5/23, Devoll: | "Counted 2800" |
| | "Is that right" |
| 9/5/23, Johnson: | "Yes bs as always mfers always take advantage always" |
| | "I will getu another 200 I'm sorry" |
| 10/15/23, Johnson: | "Put mins on other phone" |
| 10/26/23, Johnson: | "Why the fuck r u messaging this on this phone" |
| | "I'm not sending any money threw any banks" |
| 10/27/23, Johnson: | "Turn the damm phone on please this isn't a joke I'm trying to talk to u about important shit one of the things being the money u want and r begin hella un fair about idk what u don't get about federal investigation means their not gonna be no sending no cash from bank to bank idc the amount." |
| | "Idc if its 5 bucks I won't be doing that bs watch how they will already try to say something about all the past |

times I sent u money ur not listening and being petty and doing shit that can bring more issues."

10/27/23, Devoll: "I'll call you back"

I'll call you back on the other line

10/27/23, Johnson: "U will not and I repeat will not take the only thing I got to save my life right now I said I would make all the payments on time and I will u will not be late for any payments I will give my last cent before I let u not make payment on time

I haven't not held my word here and I will go send u this punk ass 2k right to ur bank threw mine and give them more to hang me idc as long as ur happy right as long as u feel ur winning a argument instead of listening and hearing I'm only trying to protect u not b u.

I have ur money and I will have money for my cart order sent on time don't take the only thing I got to save my life right now I can't help that is the way I gotta order the stuff I will not let u down it will all b oayed on time."

"I'm done with everyone treating me this way I won't be around I wont bother u I wont let ur family so how bad ur son is so I won't embarrass u I will stay away

And I have everything figured out so the carts money will b on time in advance before it's due on the card."

¶ 14    Referring at times to messages that do not all appear in the exhibit in the record, Jury stated,

> "In those text messages, he's telling his mother to order more packaging material, order more—she sends him pictures of blunts and says: Do you want me to order these? And he says yes. And then—she also asks if we should order more caps, like lids to the packaging material that was used in the THC juices. And there's another text message where she asks for a—or he asks her for hydration stones. These hydration stones, they're used when there's large amounts of cannabis that's going to be sitting for a little bit because there's so much it takes a little bit to sell, they put these hydration stones inside the cannabis so it doesn't dry out."

Jury testified that cannabis and THC juices found at the Roncevalles property had the same packaging materials sent by Devoll. Jury also opined "carts" in the text messages referred to THC cartridges.

¶ 15    Jury also testified about phone calls he listened to at the county jail where Johnson spoke to Devoll. In one call, Johnson referred to himself as a "gangster." In another, they discussed money found at the Roncevalles property. Jury described that conversation as follows:

> "Here where [Devoll] is saying that there was money in the closet and money located at the search warrant, [Johnson] said they confiscated it because I'm a drug dealer, so she said: I know, I figured that. You know what, it's worth a try because it's for your bills and house stuff, so I figured I might as well do all I can, babe."

¶ 16    On cross-examination, Jury stated he was not aware of any time Devoll went to the Roncevalles property and saw drugs there. Jury admitted Devoll never said in the text messages

that she knew what the clear bottles she purchased for Johnson were for. There were also no messages in which Johnson specifically admitted to selling drugs. Jury knew Johnson was paying Devoll money for rent. Jury testified that the LLC mentioned in the messages purported to be fitness-related and in connection with Johnson's role as a personal trainer. Jury did not investigate whether Johnson was employed or operated a personal training business. However, Jury testified that the only evidence of a fitness business at the Roncevalles property was the presence of steroids in the refrigerator, which he said was indicative of being for personal use. He also testified that it was common for drug dealers to incorporate a business to mask their illegal activity, and he believed that is what Johnson had done. Jury did not recall seeing a computer at any of the properties. Jury verified that Devoll was not charged with any crimes and stated there was no probable cause to charge her.

¶ 17        Mark Castronovo testified that he was a detective with the Rockford Police Department and investigated Johnson's drug activity. Castronovo generally gave testimony about the investigation consistent with Jury's. He added that boxes for the cell phones seized from Johnson during his arrest were found at the Roncevalles property. He also testified there was evidence from text messages that Devoll purchased containers, lids, bags, packaging materials, a heat press, and carts for Devoll. Castronovo further testified about other phone records not involving Devoll in which Johnson communicated with a woman, Lauren Caruana, in which Johnson asked her to come to his residence to teach him how to make THC juices.

¶ 18        Castronovo testified that Johnson had previous drug convictions in Illinois, Indiana, and Wisconsin. He indicated Devoll had previously posted bond for Johnson in a case. Documents were admitted showing Johnson's previous drug convictions.

¶ 19        After Castronovo's testimony, the State rested, and Devoll moved for a directed

finding. The trial court denied the motion and moved on to Devoll's case.

¶ 20    Devoll testified she was retired and had homes in Wisconsin and Florida. She purchased the Roncevalles property in November 2022 for $150,000, resulting in a warranty deed that was recorded on December 2, 2022. Devoll provided documents showing she paid for the property, paid taxes on it, and insured it. She also purchased some furniture for the property. The insurance company valued the replacement cost of the property (*i.e.*, if it had to be rebuilt) at over $400,000. Devoll indicated Johnson moved into the Roncevalles property shortly after it was purchased. He paid Devoll $1,600 in monthly rent and reimbursed her for utilities, which were $100 to $300 per month. He also paid $900 per month for rent at the 23rd Street property and reimbursed Devoll for utilities.

¶ 21    Devoll admitted she knew Johnson had a criminal history. She said she purchased the Roncevalles property to help him get away from his previous lifestyle of dealing drugs, as she hoped he was trying to make a change for the better. She believed Johnson was "going back to his personal training business." Devoll testified that she helped Johnson set up an LLC for his personal training and nutrition company because he did not have a computer. She also testified Johnson did his business at the gym. The principal place of business for the LLC was listed as an address Johnson previously shared with Caruana. Devoll said Johnson did not want the Roncevalles property listed because his probation officer used Caruana's address and phone number, as he had lived with Caruana on and off. Devoll indicated Caruana used to be part of Johnson's personal training business and helped him with recordkeeping.

¶ 22    Devoll testified that she visited the Roncevalles property in mid-October 2023 when she was traveling from Wisconsin to Florida with several friends, but she did not stay there. Devoll provided receipts for her hotel stays during that visit. Devoll said that they painted and

cleaned the property and she did some of Johnson's laundry. Devoll said she was everywhere in the house and did not see any signs of illegal activity. Devoll testified she saw two big jugs of protein powder at the property and said Johnson had used protein powder all of his life. She also said she saw containers for packaging of nutritional supplements and said, "There was different things in one of the bedrooms, but I don't remember exactly what it was." Devoll testified that, if she knew of illegal activity, she would not condone it.

¶ 23　　　　Regarding purchases made for Johnson, Devoll testified purchases were made online through her credit card and shipped to Johnson, who then repaid Devoll. Johnson was also listed on the credit card. Devoll said she did not herself ship any items to Johnson. When asked about the "carts" in the text messages, Devoll stated, "It was online shopping," and, "I mean, when the detectives brought up the carts, I thought it was all—well, the online shopping carts, so then I was like, I don't know." She said other transactions referenced in the text messages were for rent and utilities. Devoll again insisted she did not know Johnson had been selling drugs while he lived at the Roncevalles property.

¶ 24　　　　On cross-examination, Devoll stated her name was on the lease at the 23rd Street property, but Johnson was the tenant. That property was rented in 2020, and Devoll had been there "a handful of times" but had never stayed there. When arrangements were made for Johnson to live at the Roncevalles property, Johnson planned to sublease the 23rd Street property.

¶ 25　　　　The trial court questioned Devoll about how Johnson got money to pay her rent. She said she believed he was doing personal training and was paid in cash, checks, or money orders. She testified Johnson did not have a checking account because he was unable to get one. He also did not have a checking account for his business. Thus, he would convert cash to a money order to pay Devoll. The court also had the following colloquy with Devoll:

"Q. You're up in [Wisconsin]. You're just getting money into this account, that's what I'm understanding?

A. Yes, because—

Q. And you didn't have any questions about where this money was coming from?

A. I didn't ask him. There was lots of things that I would not even want to know, so—he did a lot of personal training and he was at the gym a lot too.

Q. How do you know that, you said you weren't even here?

A. Because I would call him, and he wouldn't answer his phone, and he's like: Sorry, I was in the gym, so—you're right, I didn't physically see him there, no.

Q. So you just accepted that the money was coming in and accepted his representations that it was all from personal training?

A. I didn't ask. I have no idea how kind of—what money came from where. I have no way of knowing."

¶ 26   The trial court denied Devoll's motion for a directed finding at the close of the evidence.

¶ 27   In a thorough written order, the trial court found that the State proved its claim for forfeiture by a preponderance of the evidence. The court found that the Roncevalles property was used to facilitate criminal activity and was directly connected to the criminal activity at the 23rd Street property.

¶ 28   The trial court next found that Devoll was not an innocent owner of the property. Based on the text messages, the joint credit card, Devoll's purchases of packaging materials for

Johnson, her knowledge of Johnson's criminal history, and her lease of the 23rd Street property, the court found Devoll knew of, or purposely turned a blind eye to, Johnson's criminal activity. In particular, the court found Devoll's claim that she was unaware of Johnson's criminal activity lacked credibility. The court wrote that, at a minimum, Devoll consciously and purposefully ignored readily discernable information and signs of Johnson's drug operation and tacitly facilitated his criminal enterprise by way of her own conduct. Finally, the court found the forfeiture, while being a harsh penalty, did not violate the eighth amendment or the Forfeiture Act.

¶ 29       This appeal followed.

¶ 30                              II. ANALYSIS

¶ 31       On appeal, Devoll contends the trial court erred because (1) the State failed to prove a *prima facie* case for the forfeiture, (2) she was an innocent owner, and (3) the forfeiture was an excessive fine in violation of the eighth amendment and the proportionality provision of the Forfeiture Act. Devoll focuses primarily on her constitutional claim. However, an appellate court must first exhaust all potential nonconstitutional grounds for resolving a case before reversing on a constitutional issue. *In re E.H.*, 224 Ill. 2d 172, 178 (2006). Accordingly, we address her other arguments first.

¶ 32       Before reaching our analysis, we compliment the trial court on the thoroughness of its written decision. The court laid out both its factual findings and its legal reasoning in great detail. It is always helpful to a reviewing court when the trial court clearly expresses its findings and analysis, and here the trial court's efforts were exemplary.

¶ 33                       A. Sufficiency of the Evidence

¶ 34       Devoll contends the trial court erred in finding the State sufficiently proved the Roncevalles property was subject to forfeiture.

¶ 35　　　　Under section 12(a)(6), (b) of the Cannabis Control Act (720 ILCS 550/12(a)(6), (b) (West 2024)) and section 505(a)(6), (b) of the Illinois Controlled Substances Act (720 ILCS 570/506(a)(6), (b) (West 2024)), real property that is used or intended to be used to facilitate the manufacture, distribution, sale, receipt, or concealment of a substance containing cannabis or used to commit or in any manner facilitate the commission of a violation of the Controlled Substances Act is subject to forfeiture and may be seized under the Forfeiture Act. An acquittal or dismissal in a criminal proceeding does not preclude civil proceedings under the Forfeiture Act. 725 ILCS 150/9(J) (West 2024).

¶ 36　　　　Forfeiture proceedings are civil *in rem* proceedings against items used in the commission of crimes. *People v. 1998 Lexus GS 300*, 402 Ill. App. 3d 462, 465 (2010). In forfeiture proceedings, the State brings the action against seized property under the legal fiction that the property itself is guilty of facilitating a crime. *People v. Parcel of Property Commonly Known as 1945 North 31st Street, Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 497 (2005).

¶ 37　　　　When the State seizes real property, the Forfeiture Act provides for a judicial *in rem* procedure. 725 ILCS 150/9 (West 2024). The state's attorney initiates the action by filing a verified complaint for forfeiture. *Id.* § 9(A). Only an owner or interest holder may file an answer asserting a claim against the property. *Id.* § 9(C).

¶ 38　　　　Where the State seeks forfeiture of real property, it must show by a preponderance of the evidence that the property is subject to forfeiture on one (or a combination of) these bases:

> "(a) that the claimant was legally accountable for the conduct giving rise to the forfeiture;
>
> (b) that the claimant solicited, conspired, or attempted to commit the conduct giving rise to the forfeiture; or

(c) that the claimant had acquired or stood to acquire substantial proceeds from the conduct giving rise to its forfeiture other than as an interest holder in an arm's length transaction;

(d) that the claimant is not the true owner of the property;

(e) that the claimant acquired the interest:

(1) before the commencement of the conduct giving rise to the forfeiture and the person whose conduct gave rise to the forfeiture did not have authority to convey the interest to a *bona fide* purchaser for value at the time of the conduct; or

(2) after the commencement of the conduct giving rise to the forfeiture and the owner or interest holder acquired the interest as a mortgagee, secured creditor, lienholder, or *bona fide* purchaser for value without knowledge of the conduct that gave rise to the forfeiture, and before the filing in the office of the recorder of deeds of the county in which the real estate is located a notice of seizure for forfeiture or a *lis pendens* notice." *Id.* § 9(G)(ii).

¶ 39 " '[I]n a forfeiture case, the circuit court, as the trier of fact, determines the credibility of the witnesses and evaluates their testimony.' " *People v. $111,900, U.S.C.*, 366 Ill. App. 3d 21, 29 (2006) (quoting *1945 North 31st Street*, 217 Ill. 2d at 507). The court may also draw reasonable inferences and reach conclusions to which the evidence lends itself. *Id.*

¶ 40 A trial court's findings in a forfeiture proceeding will not be disturbed unless they are against the manifest weight of the evidence. *People v. One 1999 Lexus*, 367 Ill. App. 3d 687, 689 (2006). "A judgment is against the manifest weight of the evidence only where the opposite

conclusion is clearly evident or where the factual findings upon which it is based are unreasonable, arbitrary, or not based on the evidence." *IMC Global v. Continental Insurance Co.*, 378 Ill. App. 3d 797, 804 (2007).

¶ 41　　　　Here, the trial court found the State proved by a preponderance of the evidence that the Roncevalles property was used for the manufacture, packaging, and distribution of controlled substances. The court then found the State sufficiently proved Devoll was legally accountable for the conduct giving rise to the forfeiture, conspired in the conduct giving rise to the forfeiture, and gained financially from that conduct.

¶ 42　　　　1. *Whether Devoll Is Legally Accountable for Johnson's Conduct*

¶ 43　　　　As noted above, forfeiture is permissible where the property owner is "legally accountable" for the criminal conduct giving rise to the forfeiture. Here, the conduct giving rise to the forfeiture is the criminal drug offenses Johnson was convicted of committing. The Forfeiture Act does not define what legal accountability for such conduct means in this context, but it would be circular to define it in a way which means "justifying forfeiture" (as the purpose of the *in rem* hearing is to determine *whether* property is subject to forfeiture). A more reasonable interpretation is that the evidence must show that the property owner herself was criminally culpable for the conduct supporting forfeiture, whether as established by a criminal conviction or proved by a preponderance of the evidence at the hearing.

¶ 44　　　　Here, Jury testified that the State lacked probable cause to seek to hold Devoll criminally responsible for any of the illegal conduct at issue. Furthermore, the State's written closing argument following the hearing did not even argue that Devoll was "legally accountable for the conduct giving rise to the forfeiture." We conclude that the trial court's finding that the property was forfeitable on this basis is against the manifest weight of the evidence.

¶ 45      2. *Conspiring in the Conduct Leading to Forfeiture*

¶ 46    Section 9(G)(ii)(b) of the Forfeiture Act also provides that property may be forfeited where "the claimant solicited, conspired, or attempted to commit the conduct giving rise to the forfeiture." 725 ILCS 150/9(G)(ii)(b) (West 2024). While there may also be separate criminal offenses for solicitation, conspiracy, or attempt, we presume that subsection (b) was not intended to be duplicative of subsection (a)'s "legally accountable" provision. See *People v. Baskerville*, 2012 IL 111056, ¶ 25 (holding that courts should avoid an interpretation of a statute that renders another provision superfluous or redundant and should instead presume that each part has meaning). Consequently, we give the words "solicitation," "conspiracy," and "attempt" their common, ordinary meaning rather than tying them to strict definitions from the criminal law.

¶ 47    The record clearly showed the Roncevalles property was used as part of Johnson's greater drug-dealing business involving the 23rd Street property, where significant amounts of drugs were found. Additionally, some indeterminate amount of substances containing THC were found at the Roncevalles property, along with packaging materials appearing to have a connection to the activities at the other property.

¶ 48    Devoll testified that she had no actual knowledge of Johnson's illegal activity, but the trial court was not required to credit her testimony in light of other evidence. Devoll admitted that she knew of Johnson's extensive criminal history. Then, in text messages, Johnson told Devoll that probation was looking into him, that he was again under investigation, that he was scared, and that he needed another place to live because his house—at that time, the Roncevalles property— had been compromised. He also told Devoll he could not send money through the bank and referenced a federal investigation.

¶ 49    Further, Devoll had a joint credit card with Johnson, and she purchased (and was

reimbursed for) packaging materials for Johnson that were sent to the Roncevalles property that matched packaging Johnson used for his drug business. While Devoll claimed she thought "carts" meant online shopping carts and that packaging was for nutritional supplements, the trial court found her testimony lacked credibility. Other than Devoll's mention of the presence of protein powder for Johnson's personal use, nothing indicated Johnson was packaging nutritional supplements.

¶ 50        With respect to the LLC, which Devoll helped set up for Johnson, we note that the record here is somewhat undeveloped concerning its connection to any of his drug activities. The record certainly supports the conclusion that a corporate entity *can* be used to hide the proceeds of drug activity, but there was no evidence that this occurred in this case. Moreover, police acknowledged that they never investigated whether Johnson, as claimed, earned income from his personal training activities or whether the LLC actually functioned for that purpose. Given that the theorized purpose of the LLC was to serve as a conduit for drug proceeds, the complete lack of evidence about the LLC's finances severely reduces the probative impact of this evidence here.

¶ 51        Considering all of the evidence, including Devoll's knowledge of, and involvement in, Johnson's criminal activity, we conclude that the trial court's finding that Devoll conspired in the conduct giving rise to the forfeiture is not against the manifest weight of the evidence. An opposite conclusion is not clearly evident, and the court's factual findings are not unreasonable, arbitrary, or not based on the evidence.

¶ 52                    3. *Acquisition of Proceeds of the Illegal Conduct*

¶ 53        Another ground for forfeitability found by the trial court is found in section 9(G)(ii)(c), which allows for forfeiting property where "the claimant had acquired or stood to acquire substantial proceeds from the conduct giving rise to its forfeiture other than as an interest

- 19 -

holder in an arm's length transaction." 725 ILCS 150/9(G)(ii)(c) (West 2024).

¶ 54        The evidence here does not support the conclusion that Devoll profited from Johnson's drug activity beyond his payment of rent and reimbursement of utilities and other expenses. As the trial court noted, Devoll "admitted to receiving large lump sum cash payments from [Johnson] *to reimburse her*" for the purchases made on their joint credit card account. While certainly this evidence supports the conclusion that Devoll may have been complicit to some extent in her son's misconduct, it does not show that she profited from it, much less that she received "substantial proceeds" from the conduct at the Roncevalles property giving rise to its forfeiture.

¶ 55        While Johnson paid Devoll rent on both of the properties in question, there is no evidence that these were sham transactions or that the rental rates were unreasonable. When the Forfeiture Act excludes proceeds received "in an arm's length transaction" from this determination (*id.*), we interpret it to mean that Devoll's receipt of rent and reimbursements do not constitute "proceeds" of the wrongful conduct if they merely reflect equivalent value received. Contrary to the State's assertion at oral argument, the existence of a family relationship between Devoll and Johnson does not mean that their transactions were not at arm's length. See, *e.g.*, *Para Dynamic Enterprises, LLC v. Lamb-Ferrara*, 2022 IL App (3d) 210529-U, ¶ 30 (commenting that a family relationship between contracting parties did not establish that their relationship was not at arm's length). We also note that the proceeds must flow from "the conduct giving rise to [the property's] forfeiture" to be relevant here, and the record contains no hint as to whether any of the funds Devoll received flowed from Johnson's activities at the Roncevalles property in particular. 725 ILCS 150/9(G)(ii)(c) (West 2024).

¶ 56        Considering all of the evidence, we conclude that the trial court's finding that Devoll received "substantial proceeds" from Johnson's wrongful conduct which led to the

forfeiture of the Roncevalles property is against the manifest weight of the evidence.

¶ 57                            B. Innocent Owner Defense

¶ 58        Devoll next argues the trial court erred in determining she was not an innocent owner of the property. We first note Devoll did not file a motion seeking an innocent owner hearing before trial, which would have allowed for a separate hearing on the issue under the Forfeiture Act. *Id.* § 9.1. Nevertheless, the court allowed her to present evidence and argue the issue.

¶ 59        There seemed to be some confusion below about the interplay between the State's forfeiture case (where the State had the burden of proof to show Johnson's culpability) and the innocent owner case (where Devoll had the burden of proving she was not culpable). In our view, this is completely understandable because the current provisions of the Forfeiture Act do not always mesh neatly with the old ones.

¶ 60        Prior to 2018, the State's burden of proof was *lower* than the burden faced by a claimant seeking to establish innocent ownership. The law at that time provided:

> "In a proceeding under the Forfeiture Act, the State has the initial burden of showing the existence of probable cause for forfeiture of the property. 725 ILCS 150/9(G) (West 2002). When the State satisfies its burden of establishing probable cause, the burden shifts to the claimant to show by a preponderance of the evidence that the property is not subject to forfeiture. 725 ILCS 150/9(G) (West 2002). A claimant may satisfy this burden by establishing one of the innocent-owner defenses provided in section 8 of the Forfeiture Act. 725 ILCS 150/8 (West 2002). 'If the State does show existence of probable cause and the claimant does not establish by a preponderance of the evidence that the claimant has an interest that is exempt under Section 8 of this Act, the court shall order all property forfeited to

- 21 -

the State.' " *Parcel of Property Commonly Known as 1945 N. 31st St., Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 498, (2005) (quoting 725 ILCS 150/9(H) (West 2002)).

¶ 61     This burden-shifting scheme allowed the State to preliminarily prevail by meeting a lower burden (probable cause), while the property owner was required to overcome that showing by a higher standard of proof (preponderance of the evidence). However, the scheme was later amended by statute:

> "However, in 2018, due to criticism of the burden of proof tilting heavily in the State's favor, the General Assembly amended the Forfeiture Act. See Pub. Act 100-512, § 170 (eff. July 1, 2018) (amending 725 ILCS 150/9); see also 100th Ill. Gen. Assem., House Proceedings, June 23, 2017, at 5-6 (statements of Representative Guzzardi). The General Assembly eliminated the burden-shifting framework set forth in the original version of the statute and placed the burden of proof solely on the State, while also elevating the State's burden of proof from a mere showing of probable cause to proving its case by a preponderance of the evidence. *Id.*" *People v. $33,260 United States Currency*, 2024 IL App (4th) 231465, ¶ 19.

¶ 62     In our view, the proceedings below demonstrated that confusion likely lingers about the status of the innocent owner hearing now that the statutory scheme has been changed and the burden of proof has been placed squarely on the State. The innocent owner hearing is now set forth in section 9.1 of the Forfeiture Act, and it allows a claimant to assert a claim of innocent ownership "prior to trial." 725 ILCS 150/9.1(a) (West 2024). The bases for establishing innocent ownership closely resemble the elements the State must prove *if* the case goes to a final hearing:

"(1) that the claimant filing the motion is the true owner of the conveyance as interpreted by case law;

(2) that the claimant was not legally accountable for the conduct giving rise to the forfeiture or acquiesced in the conduct;

(3) that the claimant did not solicit, conspire, or attempt to commit the conduct giving rise to the forfeiture;

(4) that the claimant did not know or did not have reason to know that the conduct giving rise to the forfeiture was likely to occur; and

(5) that the claimant did not hold the property for the benefit of, or as nominee for any person whose conduct gave rise to its forfeiture, or if the owner or interest holder acquired the interest through any such person, the owner or interest holder did not acquire it as a *bona fide* purchaser for value, or acquired the interest without knowledge of the seizure of the property for forfeiture." *Id.* § 9.1(a)(1)-(5).

¶ 63 If the claimant proves what is required under section 9.1 by a preponderance of the evidence, the subject property is returned to the claimant. *Id.* § 9.1(d). However, if the claimant does not prevail, the result is not a determination of forfeitability. Instead, "the forfeiture case shall proceed according to the Code of Civil Procedure." *Id.*

¶ 64 Here, the trial court assessed the situation perfectly. It noted that no innocent owner motion had been filed, so no hearing was required. The failure to file a motion did not, however, affect the issues to be resolved at the hearing on the merits of forfeiture. The court allowed Devoll to present evidence at the hearing, not as part of an innocent owner "defense," but simply as her opportunity to contest the State's case. Consequently, while the parties here have briefed the issue in a manner which suggests that there is a separate question of innocent ownership, any such

question is entirely wrapped within the factors the State was required to prove under section 9(G)(ii) in order to establish forfeitability of the subject premises. Consequently, our analysis in the preceding question completely resolves the issues raised in that regard, and we need not separately examine whether Devoll is an innocent owner under the statute.

¶ 65                                    C. Excessive Fine

¶ 66        Finally, Devoll argues the trial court erred in finding the forfeiture did not violate the excessive fines clause of the eighth amendment of the United States Constitution and the proportionality provision of the Forfeiture Act.

¶ 67        The eighth amendment provides "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. "Civil forfeiture proceedings serve, at least in part, to punish the owner of the property subject to forfeiture and are therefore subject to the excessive fines clause, even though the forfeiture may also serve a remedial purpose." *People v. One 2005 Acura RSX*, 2017 IL App (4th) 160595, ¶ 19 (citing *Austin v. United States*, 509 U.S. 602, 618 (1993)). Section 9.5 of the Forfeiture Act also incorporates eighth amendment protections, stating property forfeited under the Act shall be subject to an eighth amendment to the United States Constitution disproportionate penalties analysis. 725 ILCS 150/9.5 (West 2024).

¶ 68        Forfeitures are generally disfavored under the law, and courts must be vigilant in safeguarding the rights of innocent persons who have legitimate interests in the property at issue. *People v. 1991 Chevrolet Camaro*, 251 Ill. App. 3d 382, 388 (1993). " 'It is well-settled that a punitive forfeiture of property violates the excessive fine clause of the eighth amendment if it is grossly disproportional to the gravity of the offense for which it is forfeited.' " *People v. One Black 2016 Jeep Wrangler Unlimited*, 2025 IL App (2d) 240314, ¶ 41 (quoting *People v. One 2014 GMC*

*Sierra*, 2018 IL App (3d) 170029, ¶ 43). Our supreme court has adopted a three-pronged test to guide courts in determining whether a forfeiture is constitutionally excessive. Under this test, we consider (1) the inherent gravity of the offense compared with the harshness of the penalty, (2) whether the property was an integral part of the commission of the crime, and (3) whether the criminal activity involving the property was extensive in terms of time and/or spatial use. *People ex rel. Waller v. 1989 Ford F350 Truck*, 162 Ill. 2d 78, 89-90 (1994); *One 2005 Acura RSX*, 2017 IL App (4th) 160595, ¶ 20. That test was derived from *United States v. Real Property Located at 6625 Zumirez Drive, Malibu, California*, 845 F. Supp. 725 (C.D. Cal.1994), and has come to be known as the *Zumirez* test. The factors are not exclusive, and the inquiry must be conducted on a case-by-case basis. *1989 Ford F350 Truck*, 162 Ill. 2d 78 at 90; *One 2000 GMC*, 357 Ill. App. 3d 873, 876 (2005).

¶ 69        We also note that not all of Johnson's actions should be considered when assessing whether an excessive fine has been imposed on Devoll. Her culpability must be assessed based upon her own knowledge and actions, not the knowledge of the wrongdoer. *People ex rel. Hartrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶ 25.

¶ 70        In recognition that the inquiry here is focused on determining whether there is gross disproportionality between the misconduct and the fine (*United States v. Bajakajian*, 524 U.S. 321, 336-37 (1998)), we pause to examine what the record supports in terms of a concrete measure of either. While our review of the constitutional issue here is undertaken *de novo* (*One 2005 Acura RSX*, 2017 IL App (4th) 160595, ¶ 19), we defer to the trial court's credibility and factual findings unless they are against the manifest weight of the evidence (*2010 Harley-Davidson*, 2018 IL 121636, ¶ 13).

¶ 71        First, the effective fine is dependent upon the value of the Roncevalles property.

Our courts have looked to the claimant to establish this measure. See *id.* ¶ 29 (noting that the claimant failed to present evidence of the value of the property at the hearing). Here, Devoll testified that she used her own funds to purchase the house for $150,000 approximately two years prior to the hearing. The price paid by the owner of property may be considered in assessing its value, so long as it is not misleading due to the passage of time or other factors. *Department of Public Works & Buildings v. Bloomer*, 28 Ill. 2d 267, 274 (1963). Here, we agree with the trial court that "forfeiture in this case amounts to a fine in the amount of $150,000."

¶ 72 Next, we consider whether the record allows some objective measure of the misconduct at issue here, *i.e.*, Johnson's drug offenses on the property, and in this respect, we conclude that the trial court's findings are largely unsupported by the record from the hearing. The court found that "the residence was used to store massive amounts of cannabis and cannabis products, psilocybin mushroom pills and steroids." However, "massive" is a relative term, and such a characterization is not helpful without some way to assess it relatively (*i.e.*, in comparison to something else). It would appear that the description may well be apt when it comes to the contraband found at the 23rd Street property, but that is not the property the State is attempting to forfeit.

¶ 73 When we turn to the quantitative measure of the drugs found at the Roncevalles property, the record at the hearing is completely devoid of any such information. There was an exhibit utilized at trial to refresh a witness's recollection, but the State clarified that it was not offering the exhibit as substantive evidence. The witness then gave nonspecific testimony about the drug-related items found at the Roncevalles property, stating that police found "piles" and "multiple items of packaging material" and "a bunch of cannabis wax and cannabis products as well." Such testimony tells us what was discovered, but not its quantity in either absolute or relative

terms.

¶ 74        We believe that the trial court erred in deriving further detail about the quantity of contraband produced by the search of the Roncevalles property by referencing an affidavit filed earlier in the case, but which was not offered into evidence at the hearing. Where an item is not admitted into evidence and the record does not affirmatively show that the judge considered it, the presumption is that it was not considered. *People v. Ingram*, 91 Ill. App. 3d 1074, 1084 (1980). Here, however, the court expressly cited the probable cause affidavit in its decision summarizing what materials were found when the Roncevalles property was searched. It is fundamental that the court cannot consider matters outside of the evidence admitted at trial.

¶ 75        With this clarification of the record and its limitations in mind, we now examine the relevant factors to assess whether Devoll was assessed an excessive fine.

¶ 76                1. *Was the Property an Integral Part of the Offense*?

¶ 77        We first find the property was an integral part of the commission of *some part* of Johnson's crimes. When considering whether the property was an integral part of the commission of the crime, we consider whether the property and the criminal activities were sufficiently interrelated to find the property tainted by unlawful use, thereby rendering the property forfeitable. *One 2005 Acura RSX*, 2017 IL App (4th) 160595, ¶ 28.

¶ 78        Here, the Roncevalles property and Johnson's criminal activities were interrelated. The record is clear Johnson conducted criminal activities at the property. Devoll attempts to minimize the extent the Roncevalles property was integral to Johnson's crimes by arguing the drugs found there were indicative of personal use. We disagree. Johnson stored significant amounts of packaging material and some amount of drugs at the property. There was also evidence of drug dealing having occurred on the premises. We find that this factor weighs slightly in favor of the

State.

¶ 79    2. *Extent of Criminal Activity in Terms of Time and/or Spatial Use*

¶ 80    When considering the extent of criminal activity in terms of time and/or spatial use, we look at whether the "property played an extensive or pervasive role in the commission of the crime." *Zumirez*, 845 F. Supp. at 734. We also consider the time period over which the property was used and the spatial use of the property. *One 2005 Acura RSX*, 2017 IL App (4th) 160959, ¶ 30.

¶ 81    As previously noted, there was evidence of drug dealing at the Roncevalles property, as well as cannabis products found after it was searched. However, the record is devoid of any measure of this contraband—such as its weight or street value—other than Jury's testimony that police found "piles" of packaging materials and "a bunch of cannabis wax and cannabis products." This makes it difficult to find that the "property played an extensive or pervasive role in the commission of" Johnson's crimes. *Zumirez*, 845 F. Supp. at 734. The evidence suggests that the majority of Johnson's drug business was conducted at the 23rd Street property, and the record shows that he was charged and convicted based only on material found at properties other than the one in question.

¶ 82    We also find it significant that the evidence of drug dealing at the Roncevalles property spanned a time period from roughly August 2023 to early January 2024 (when the search warrant was executed), a period of only five months and less than half the time Johnson resided at or used the property. Given that the property in question is real property, this represents only a small fraction of what would normally be considered the lifespan of real estate (as opposed to, for example, a motor vehicle).

¶ 83    Thus, we cannot find that the extent of criminal activity in terms of time or spatial

use of the property weighs in favor of the State.

¶ 84    3. *The Gravity of the Offense Compared to the Harshness of the Penalty*

¶ 85    In addressing Devoll's eighth amendment claim, we find the gravity of the offense compared to the harshness of the penalty weighs in Devoll's favor. In weighing the inherent gravity of an offense compared to the harshness of the penalty, we first consider that " 'violent crimes are more serious than nonviolent crimes, completed crimes are more serious than attempted crimes, and intentional conduct is more culpable than negligent conduct.' " *One 2005 Acura RSX*, 2017 IL App (4th) 160595, ¶ 23 (quoting *Zumirez*, 845 F. Supp. at 733).

¶ 86    "In addition, because a civil forfeiture may be instituted without showing a claimant is guilty of any offensive conduct, a court should first determine into which category a claimant's conduct falls." *Id.* "These categories include situations where '(1) the claimant has been convicted of the criminal act or acts underlying the forfeiture; (2) the claimant has never been charged with any crime; and (3) the claimant has been charged [with] and acquitted of the act or acts underlying the forfeiture.' " *Id.* (quoting *Zumirez*, 845 F. Supp. at 733). "The gravity of a claimant's conduct decreases in each situation." *Id.* Of particular note is that

> " '[w]henever the claimant's conduct falls outside of the first category, the court must be careful to focus only on the inherent gravity of the offensive conduct engaged in by the claimant himself, rather than the inherent gravity of the offense or offenses that the government had probable cause to believe were committed on the property.' " *Id.* (quoting *Zumirez*, 845 F. Supp. at 733).

However, our supreme court has also stated that when "reviewing a property owner's degree of culpability, a court must consider any 'criminal conduct he or she let transpire on the property.' " *2010 Harley-Davidson*, 2018 IL 121636, ¶ 25 (quoting *Von Hofe v. United States*, 492 F.3d 175,

185 (2d Cir. 2007)).

¶ 87        In evaluating the harshness of the penalty against the fine imposed, we must consider not only the monetary value of the property forfeited, but also the intangible value of the property. *One 2005 Acura RSX*, 2017 IL App (4th) 160595, ¶ 24. "A higher value is placed on real property, particularly a home, than on personal property." *Id.* We also have rejected an analysis that simply compares the maximum fine available for an offense with the claimant's equity interest in the forfeited property. *Id.* ¶ 22 Although the maximum fine available may be relevant to determine the seriousness of the claimant's conduct, it does not alone determine whether the inherent gravity of that conduct outweighs the harshness of the penalty. *Id.*

¶ 88        Here, while drug dealing is a serious, albeit nonviolent, offense, and Johnson's overall drug activity was extensive. However, a critical factor is that Devoll herself was not charged with any crime at all (and Jury specifically testified there was a lack of probable cause to do so). Because Devoll's conduct fell outside of the first category of conduct, so our focus must be on the inherent gravity of her misconduct rather than the inherent gravity of the offense or offenses the government had probable cause to believe Johnson committed on the property.

¶ 89        When Devoll's conduct is considered, the most that can be said is that she (1) ordered packaging supplies to be delivered to the property, (2) assisted Johnson in forming an LLC, which could have been used as cover for his drug business but is not shown by the record to be such, and (3) collected rent or reimbursements from Johnson that may have been derived from drug sales, though these payment were not shown to have been in excess of market rental rates or beyond what was necessary for reimbursement. The record does not suggest, and the trial court did not find, that Devoll was *profiting* from Johnson's drug sale proceeds. Thus, while the record supports the court's conclusion that Devoll was aware of Johnson's drug activity and aided it in

some fairly minor respects, the record does not show that she was a highly integral part of it.

¶ 90     We should also consider any criminal activity the claimant allowed others to conduct on the property. Devoll was the property owner renting to Johnson when she knew he was engaged in some form of drug dealing. However, the record is unclear whether Devoll knew the activity was occurring primarily at the Roncevalles property (and, as noted above, it is Devoll's knowledge that is key). While there was evidence Devoll purchased packaging materials that were shipped there, there was a lack of evidence she knew of the extent of the drug business that occurred at the Roncevalles property.

¶ 91     *4. Consideration of All Factors*

¶ 92     The essential facts of this case boil down to these elements:

(1) Devoll was aware of her son's prior drug convictions;

(2) Devoll knew, or had reason to know, that he was continuing to engage in illicit drug transactions while he resided at the Roncevalles property;

(3) Devoll assisted her son by ordering packaging material that she reasonably should have known was being used in his drug business;

(4) Devoll assisted her son in the creation of an LLC, which might potentially be used to mask drug profits, though there is no evidence of that occurring here;

(5) Devoll received rent payments and reimbursements from her son that she should reasonably have known were the proceeds of his illegal activity, but the record does not demonstrate that these payments were greater than market rental rates or in excess of any reimbursement she was owed;

(6) Substances containing THC were found at the Roncevalles property, but

the hearing record contains no measurement of their quantity, street value, or the equivalent street-value fine;

(7) Devoll herself never participated directly in any illegal activity, and the State concedes that it lacked probable cause to charge her; and

(8) The effective fine that the State seeks to impose on Devoll is equivalent to $150,000 in the form of forfeiture of the Roncevalles property.

¶ 93 Under these facts, and reviewing the matter *de novo*, we conclude that forfeiture of the Roncevalles property would contravene the excessive fines clause of the eighth amendment. Accordingly, we reverse the trial court's order of forfeiture.

¶ 94 III. CONCLUSION

¶ 95 For the reasons stated, the decision of the trial court is reversed.

¶ 96 Reversed.